1  Matthew A. Goldberg, OSB #052655
   Emerge Law Group
2  805 SW Broadway, Suite 2400
   Portland, OR 97205
3  Tel: (503) 227-4525
   Email: matt@emergelawgroup.com
4
   Nicholas A. Kampars, OSB #063870
5  Wendell Kusnerus, OSB #792922
   Davis Wright Tremaine LLP
6  1300 SW Fifth Avenue, Suite 2400
   Portland, OR 97201
7  Tel: (503) 241-2300
   Email: nicholaskampars@dwt.com
8
   Of Attorneys for Plaintiffs
9

10              IN THE UNITED STATES BANKRUPTCY COURT

11                 FOR THE DISTRICT OF OREGON

12
   In Re:
13
   CHRISTOPHER P. SPOTO                    Case No. 17-31502-tmb7
14
                          Debtor.
15
   JENNIFER ANDLOVEC, an individual;
16 SHAMUS RYAN, an individual; HIROMI      Adversary Case No.
   HEIDER, an individual; JULIA RAE
17 SANDERSON, an individual; GARY and
   NANCY LAZARUS, Trustees of the Edwards  COMPLAINT OBJECTING TO
18 Lazarus Family Trust Dated 1994; KILEY  DISCHARGEABILITY OF A DEBT
   LAZARUS and NATHAN LAZARUS,
19 husband and wife and the marital community
   thereof; PHILIP JONES, an individual;
20 RICHARD BROWN DEWITT, an individual;
   HAROLD WAYNE ROBINSON, an
21 individual; and JEFFERY CALLAHAN, an
   individual,
22
                          Plaintiffs,
23
           v.
24
   CHRISTOPHER SPOTO, an individual,
25
                          Defendant.
26

Page 1 – COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT

4845-7238-9452v.4 0108718-000001

Plaintiffs allege:

1. This is an adversary proceeding under 11 U.S.C. § 523(c) for a determination excepting certain debts of Defendant Chris Spoto from discharge.

2. This Court has jurisdiction of this action under 28 U.S.C. § 1334, and this adversary proceeding constitutes a core proceeding.

3. Venue lies in the District of Oregon as this is a proceeding arising under Chapter 7 of the Bankruptcy Code, and the petition was filed in the District of Oregon.

**PARTIES**

4. Plaintiffs are members of Farmington Industries, LLC (the "Company"), an Oregon limited liability company. Collectively, Plaintiffs are the owners of 60% of the membership interests in the Company.

5. Defendant is the owner of 40% of the membership interests in the Company.

**FACTS**

6. In January 2015, Defendant and plaintiff Jeffery Callahan decided to form a business that would participate in the Oregon cannabis industry. They agreed to use the name "Farmington Industries, LLC," which Defendant had previously registered with the state of Oregon (the "Company").

7. Defendant and Callahan agreed that they would each share a 50% ownership in the Company.

8. On or about June 1, 2015, the Company signed a 5-year commercial lease (the "Lease"), the premises of which was to serve as the Company's cannabis production facility. Defendant personally guaranteed the Lease on behalf of the Company.

9. Pursuant to the Lease, the Company paid a $15,000 security deposit and began paying the $5,500 monthly rent.

10. Beginning in June 2015, the Company made significant improvements to the leased premises, in an amount believed to be not less than $250,000.

Page 2 – COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT

1     11.     On April 29, 2016, the Company entered into an operating agreement. The

2   Operating Agreement listed two trusts as formal members, which trusts would in turn hold the

3   membership interests of Plaintiffs and Defendant.

4     12.     Pursuant to Section 5.2 of the Company's operating agreement, Defendant was

5   the sole manager of the Company.

6     13.     Pursuant to Section 5.10 of the Company's operating agreement and Oregon law,

7   at all relevant times Defendant owed the Company and the Plaintiffs the fiduciary duties of care

8   and loyalty.

9     14.     As manager of the Company, Defendant solicited money for the Company from

10  investors, including Plaintiffs, and obtained new capital from Plaintiffs.

11    15.     Plaintiffs contributed a total of $266,000 to the Company in exchange for a 60%

12  interest in the Company.

13    16.     In December 2016, the Company needed another capital infusion. Defendant

14  rejected the proposal put forth by the Plaintiff members and instead insisted that an individual

15  named Kevin Kahmann, who on information and belief was the employer of Defendant's wife,

16  be allowed to personally invest in the Company and obtain new investors to raise additional

17  capital for the Company (the "Kahmann Offer"). Defendant advocated for the Kahmann Offer

18  over any other option for the Company to obtain capital.

19    17.     Despite the two proposals that would have allowed the Company to viably

20  continue its business operations, Defendant failed to pursue either option and otherwise failed to

21  give Plaintiffs the opportunity to increase their investment in the Company.

22    18.     On February 1, 2017, Defendant executed a Lease Termination Agreement, after

23  representing to the landlord that the Company was insolvent and could no longer pay rent for the

24  leased premises. Defendant requested the return of the security deposit paid by the Company to

25  Defendant personally.

26  / / /

1      19.     On or about February 14, 2017, Defendant sent a Notice of Meeting of the

2    Members of Farmington Industries, LLC, for a meeting to occur on February 24, 2017. During

3    the meeting, Defendant employed technology that prevented the other members from

4    participating in the meeting.

5      20.     During the meeting, Defendant represented to the members that he owned 80% of

6    the Company, and based on that misrepresentation, he voted to dissolve the Company over the

7    objections of Plaintiffs.

8      21.     On March 14, 2017, Plaintiffs initiated a lawsuit in the Circuit Court for the State

9    of Oregon, for the County of Deschutes, against Defendant and others. The lawsuit was

10    captioned *Andlovec, et al. v. Spoto, et al.*, Case No. 17 CV11011 (the "Lawsuit"). A copy of the

11    Lawsuit is attached to this Complaint as Exhibit 1. The court later granted plaintiff Callahan's

12    motion to intervene and entered an order to that effect.

13      22.     In the Lawsuit, Plaintiffs alleged that Defendant breached his fiduciary duties to

14    the Company and to Plaintiffs by advocating for the Kahmann Offer, by rejecting all other offers

15    to raise capital, by terminating the Lease and requesting a return of the security deposit to

16    Defendant personally, and by dissolving the Company over the objections of the members.

17      23.     In the Lawsuit, Plaintiffs asserted claims for breach of fiduciary duty, declaratory

18    judgment, fraudulent misrepresentation and expulsion from the Company based on Defendant's

19    conduct, and sought damages.

20      24.     On April 24, 2017, Defendant filed a Chapter 7 Petition in this Court, seeking to

21    discharge his debts, including those associated with Plaintiffs' Claims in the Lawsuit.

22                  **FIRST CLAIM FOR RELIEF**

23         **(Non-Dischargeability Under 11 U.S.C. §523(a)(4))**

24      25.     Plaintiffs re-allege and incorporate paragraphs 1 through 24 above.

25      26.     As manager of the Company, Defendant occupied a fiduciary relationship with

26    respect to the Company and Plaintiffs.

Page 4 – COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT

1    27.    Plaintiffs' claims against Defendant arise out of his fiduciary relationship and the

2 fraudulent actives Defendant engaged in while he owed a fiduciary duty to the Company and

3 Plaintiffs.

4    28.    Plaintiffs are unsecured creditors with respect to the claims in the Lawsuit and the

5 alleged damages owed by Defendant.

6    29.    Plaintiffs seek a ruling declaring that the claims pled herein and in the Lawsuit

7 against Defendant are not subject to discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(4),

8 because Defendant engaged in fraud and defalcation while acting as a fiduciary to Plaintiffs.

9                              **SECOND CLAIM FOR RELIEF**

10                    **(Non-Dischargeability Under 11 U.S.C. §523(a)(6))**

11    30.    Plaintiffs re-allege and incorporate paragraphs 1 through 24 above.

12    31.    Plaintiffs' claims against Defendant seek damages based on Defendant's

13 management of the Company, and his willful and malicious injury to the Company.

14    32.    Plaintiffs are unsecured creditors with respect to the claims in the Lawsuit and the

15 alleged damages owed by Defendant.

16    33.    Plaintiffs seek a ruling declaring that the claims pled herein and in the Lawsuit

17 against Defendant are not subject to discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(6),

18 because Defendant's violations as alleged were willful and malicious.

19                              **THIRD CLAIM FOR RELIEF**

20                    **(Non-Dischargeability Under 11 U.S.C. §523(a)(19)(A))**

21    34.    Plaintiffs re-allege and incorporate paragraphs 1 through 24 above.

22    35.    As manager of the Company, Defendant occupied a fiduciary relationship with

23 respect to the Company and Plaintiffs.

24    36.    Defendant made misrepresentations to Plaintiffs with respect to the Plaintiffs'

25 investments in the Company.

26 / / /

1    37.    Plaintiffs seek a ruling declaring that the claims pled herein against Defendant are

2    not subject to discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(19)(A), because Defendant

3    made misrepresentations to Plaintiffs which were designed to deprive Plaintiffs of their

4    investment interests in the Company.

5         WHEREFORE, Plaintiffs pray for a judgment against the Defendant, as follows:

6         1.    That the Court determine that the Plaintiffs' claims for breach of fiduciary duty,

7    declaratory judgment, fraudulent misrepresentation and expulsion, and the claims pled herein,

8    are excepted from discharge under 11 U.S.C. § 523(c); and

9         2.    For such other relief as the Court deems just and equitable under the

10   circumstances.

11        DATED this 11th day of August, 2017.

12                                    EMERGE LAW GROUP

13

14                          By  s/ Matthew A. Goldberg
                                Matthew A. Goldberg, OSB #052655
                                Of Attorneys for Plaintiffs Jennifer Andlovec; Shamus
15                              Ryan; Hiromi Heider; Julia Rae Sanderson; Gary and
                                Nancy Lazarus, Trustees of the Edwards Lazarus
16                              Family Trust Dated 1994; Kiley Lazarus and Nathan
                                Lazarus; Philip Jones; Richard Brown Dewitt; and
17                              Harold Wayne Robinson

18

                                     DAVIS WRIGHT TREMAINE LLP
19

20                          By  /s/ Wendell Kusnerus
                                Nicholas A. Kampars, OSB #063870
21                              Wendell Kusnerus, OSB #792922
                                Of Attorneys for Plaintiff Jeffery Callahan
22

23

24

25

26

Page 6 – COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT

## CERTIFICATE OF SERVICE

I hereby certify that I served a copy of the attached COMPLAINT OBJECTING TO DISCHARGEABILITY OF A DEBT on the following via the Electronic Court Filing System of the U.S. Bankruptcy Court for the District of Oregon:

- ALLISON C. BIZZANO - allison@emergelawgroup.com, matt@emergelawgroup.com; jennifer@emergelawgroup.com
- Michael B Batlan - mbatlan@aol.com, mbatlan@ecf.epiqsystems.com
- ANDREW B HARRIS - bendlawyer@yahoo.com, ah@andrewharrislaw.com, ecfbankruptcybend@gmail.com
- SCOTT J MITCHELL - scott@monsonlawoffice.com
- NATHAN FREDERICK JONES SMITH - nathan@mclaw.org, OR_ECF@mclaw.org
- US Trustee, Portland - USTPRegion18.PL.ECF@usdoj.gov

As of today's date, the following parties or attorneys are not on the e-service list for this case and were served by first class U.S. mail:

Oregon Community Credit Union
PO Box 77002
Springfield, OR 97475-0146

Dated this 11th day of August, 2017.

DAVIS WRIGHT TREMAINE LLP

By __/s/ Wendell Kusnerus_____
Wendell Kusnerus – State Bar Number 792922
Attorney for Plaintiff Jeffery Callahan

Page 1 – CERTIFICATE OF SERVICE

4845-7238-9452v.4 0108718-000001

1

2

3

4

5 IN THE CIRCUIT COURT OF THE STATE OF OREGON

6 FOR THE COUNTY OF DESCHUTES

| | |
|---|---|
| 7 JENNIFER ANDLOVEC, an individual; | Case No. |
| 8 SHAMUS RYAN, an individual; HIROMI HEIDER, an individual; JULIA RAE | COMPLAINT |
| 9 SANDERSON, an individual; GARY and NANCY LAZARUS, Trustees of the Edwards | (Breach of Fiduciary Duty; Breach of Contract; ORS 28.010 *et seq.* |
| 10 Lazarus Family Trust Dated 1994; KILEY LAZARUS and NATHAN LAZARUS, husband | Declaratory Judgments Act Avoidance of Fraudulent Transfer Under ORS Ch. |
| 11 and wife and the marital community thereof; PHILIP JONES, an individual; RICHARD | 95; ORS 63.209 – Expulsion; Injunctive Relief; Aiding and Abetting |
| 12 BROWN DEWITT, an individual; and HAROLD WAYNE ROBINSON, an individual, | Breach of Fiduciary Duty; Fraudulent Misrepresentation) |
| 13 | |
| 14 Plaintiffs, | Filing Fee Authority: ORS 21.160(1)(c) |
| 15 vs. | |
| 16 | Amount in Controversy: $166,000.00 |
| 17 CHRISTOPHER SPOTO, an individual; DAVID SMILEY, P.C., an Oregon professional | **CLAIM NOT SUBJECT TO** |
| 18 corporation; DAVID SMILEY, an individual; and STORM 3 LLC, an Oregon limited liability | **MANDATORY ARBITRATION** |
| 19 company, | |
| 20 Defendants. | |
| vs. | |
| 21 | |
| 22 FARMINGTON INDUSTRIES, LLC, an Oregon limited liability company, | |
| 23 Nominal Defendants. | |

24 Plaintiffs allege against Defendants as follows:

25 ///

26 ///

Page 1 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

# SUMMARY OF THE ACTION

Plaintiffs bring this action derivatively, on behalf of Farmington Industries, LLC (the "Company") and on their own behalf as members of Company ("Members"), against Defendant Christopher Spoto for damages and other relief due to his breaches of fiduciary duty and other misconduct while acting as Manager of the Company. Plaintiffs additionally seek damages and relief against other Defendants in this action.

# PARTIES

1. At all relevant times, Plaintiff Jennifer Andlovec has been an individual residing in Seattle, Washington.

2. At all relevant times, Plaintiff Shamus Ryan has been an individual residing in Seattle, Washington.

3. At all relevant times, Plaintiff Hiromi Heider has been an individual residing in Seattle, Washington.

4. At all relevant times, Plaintiff Julia Rae Sanderson has been an individual residing in Tonasket, Washington.

5. At all relevant times, Plaintiffs Gary and Nancy Lazarus, in their capacity as Trustees of the Edwards Lazarus Family Trust Dated 1994, have resided in Bellingham, Washington.

6. At all relevant times, Plaintiffs Nathan and Kiley Lazarus have been a married couple residing in Seattle, Washington.

7. At all relevant times, Plaintiff Philip Jones has been an individual residing in Seattle, Washington.

8. At all relevant times, Plaintiff Richard Brown Dewitt has been an individual residing in Santa Cruz, California.

9. At all relevant times, Plaintiff Harold Robinson has been an individual residing in Huntsville, Alabama.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

10.     Upon information and belief, at all relevant times, Defendant Christopher Spoto ("Spoto") has been a resident of Oregon, residing in the City of Bend and County of Deschutes.

11.     Nominal Defendant Farmington Industries LLC (the "Company") was registered as an Oregon limited liability company on or about October 9, 2014 with its principal place of business located in Bend, Oregon.

12.     In this action, Plaintiffs assert claims derivatively on behalf of the Company.

13.     Plaintiffs have not formally demanded that Spoto institute suit against himself, David Smiley, P.C., David Smiley, or Storm 3 LLC because doing so would be futile. Plaintiffs' counsel did send more than one e-mail "demanding" that Spoto cease and desist in his efforts to hasten the Company's demise, all of which were either ignored or met with indignity.  Spoto is incapable of making a disinterested decision or voting in a disinterested manner on whether the Company should bring claims against him and others.

14.     At all relevant times, Defendant David Smiley, P.C. ("Smiley, P.C.") has been an Oregon professional corporation with its principal place of business located in Bend, Oregon.

15.     At all relevant times, Defendant David Smiley ("Mr. Smiley" and together with Smiley, P.C., "Smiley") has been a resident of Oregon and a licensed attorney residing in the City of Bend and the County of Deschutes.

16.     Defendant Storm 3 LLC ("Storm 3") was registered as an Oregon limited liability company on or about February 6, 2017, with its mailing address located in Bend, Oregon.

## VENUE AND JURISDICTION

17.     Venue is proper pursuant to ORS 14.080 because Deschutes County is the county in which one of the defendants resides at the commencement of the action. Venue is also proper in Deschutes County because, pursuant to Section 13.8 of the Operating

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

Agreement, which is the subject of this action, any action to enforce the Operating Agreement or any action based on any right arising out of the Operating Agreement must be brought in Deschutes County.

**FACTS**

18.     In or around January 2015, Spoto approached Jeffrey Callahan ("Callahan") in Callahan's capacity as a producer of medical marijuana in Washington State.

19.     In or around January 2015, Spoto visited Callahan's production facility in Seattle and took photos.

20.     Spoto had identified real property located at 63075 Plateau Drive, Bend, Oregon 97701 and more fully described as: Lot 39, North Brinson Business Park Phase II, Deschutes County, Oregon (the "Premises").

21.     Spoto stated he had determined that the Premises would be suitable for a cannabis production facility.

22.     After Spoto's visit to Callahan's production facility, Spoto proposed a partnership to Callahan.

23.     Callahan and Spoto agreed to form an equal partnership where they would each hold a 50% interest in any business they formed to participate in the Oregon cannabis industry.

24.     Callahan and Spoto agreed to start a cannabis production facility together, to focus initially on the cultivation of medical marijuana.

25.     They decided to use the name "Farmington Industries, LLC," which Spoto had previously registered with the Oregon Secretary of State.

26.     Pursuant to the terms of their agreement, Callahan would contribute $100,000.00 to the Company, along with his cannabis industry experience and proprietary plant genetics and Spoto would contribute $18,000.00 and secure the Premises.

27.     Consistent with the parties' agreement, Callahan did, in fact, contribute

Page 4 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

$100,000.00 to the Company, along with his industry experience and plant genetics.

28.     Spoto contributed $18,000.00 to the Company and secured the Premises for the Company to lease.

29.     On or about June 1, 2015, the Company signed a 5-year commercial lease (the "Lease") for the Premises to construct and then operate a marijuana production facility.

30.     The monthly rent under the Lease was $5,500.00.

31.     Pursuant to the Lease, the Company paid a $15,000.00 security deposit to Landlord.

32.     Spoto personally guaranteed the Lease (the "Personal Guaranty").

33.     Pursuant to the Lease, the Company was responsible for all improvements to the Premises required for the permitted use as a marijuana production facility.

34.     The Company was required, by applicable laws, regulations, and codes, to make significant improvements in order to use the Premises for marijuana production.

35.     Beginning in or around June 1, 2015, the Company made significant improvements to the Premises, in an amount believed to be not less than $250,000.00.

36.     As the Company's costs increased, the Company shifted its business strategy in early 2016 to focus on raising capital from outside investors for the purpose of obtaining a license to produce recreational marijuana.

37.     In or around the spring of 2016, the Company, through the personal efforts of both Callahan and Spoto, hired Smiley for business advice and to draft legal documents for the Company.

38.     Among the documents Smiley was hired to draft were documents that would enable the Company to raise additional capital for the Company from outside investors.

39.     Callahan, Spoto, and Smiley did not include Callahan's name in the Company documents, despite the fact that Callahan had a "financial interest" in the Company as that term is used in OAR 845-025-1000, based if nothing else on his contribution of

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

money and his expectation of owning an equal share of the Company with Spoto.

40. Based on Smiley's discussions with Callahan and Spoto, Smiley recommended that the membership interests in the Company be placed not in the names of Spoto, Callahan, and any other investors that might join the Company but into two trusts, to be drafted and formed by Smiley, with Spoto as the sole trustee.

41. Smiley drafted an operating agreement for the Company dated April 29, 2016, whereby 100% of the membership interests in the Company were to be held by the Trusts (as defined below) a copy of which he sent to Spoto and Callahan that same day (the "Operating Agreement") in an e-mail (the "4/29 E-mail"). Attached hereto as Exhibit 1 and incorporated herein by reference is a true and correct copy of the Operating Agreement.

42. Pursuant to the Operating Agreement, the Chris Spoto Revocable Trust ("Spoto Trust") owned 80% of the Company.

43. Pursuant to the Operating Agreement, Farmington Industries Trust ("Farmington Trust" and together with the Spoto Trust, the "Trusts") owned the remaining 20% interest in the Company, which would be held for future investors.

44. According to Smiley, because the Trusts incorporated Spoto's name and the name of the Company, which was already registered with the Oregon Secretary of State, the names of the Trusts would not need to be registered with the Secretary of State.

45. In the 4/29 E-mail to Callahan and Spoto, Smiley represented as follows:

    a. Smiley would send Spoto and Callahan the trust instruments by the next day;

    b. Spoto and Callahan would both be settlors of the Trusts;

    c. Spoto would be trustee of the Trusts; and

    d. Callahan would be successor trustee of the Trusts.

Attached hereto as Exhibit 2 and incorporated herein by reference is a true and correct

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1    copy of the 4/29 E-mail.

2    46.    According to Smiley, Callahan and Spoto would each own a 50% interest in the

3    Spoto Trust, which owned 80% of the Company.

4    47.    Pursuant to Section 5.2 of the Operating Agreement, at all relevant times, Spoto

5    was the sole Manager of the Company.

6    48.    Pursuant to Section 5.10 of the Operating Agreement, at all relevant times, Spoto

7    owed the Company and the Members the fiduciary duties of care and loyalty.

8    49.    Pursuant to Section 5.10 of the Operating Agreement, entitled "Fiduciary Duties

9    of Managers," at all relevant times, Spoto was required to discharge his duties of care and

10    loyalty consistently with the obligation of good faith and fair dealing.

11    50.    Pursuant to Section 5.10.1 of the Operating Agreement, at all relevant times,

12    Spoto was required to act in a manner he reasonably believed to be in the Company's best

13    interest and "use the care that a person in like position would reasonably believe

14    appropriate under the circumstances."

15    51.    Pursuant to Section 5.10.2 of the Operating Agreement, at all relevant times,

16    Spoto was required to account to the Company and hold as trustee for the Company any

17    profit or benefit derived in conducting or winding up the Company's business.

18    52.    Pursuant to Section 5.10.3 of the Operating Agreement, at all relevant times,

19    Spoto was required to refrain from dealing with a party with an adverse interest to the

20    Company in conducting or winding up the Company's business.

21    53.    Pursuant to Section 5.10.4 of the Operating Agreement, at all relevant times,

22    Spoto was required to refrain from competing with the Company in conducting

23    Company's business prior to the Company's dissolution.

24    54.    Pursuant to Section 6.2 of the Operating Agreement, at all relevant times, Spoto

25    was required to provide notice of the date, time, and place of all meetings to each

26    member in writing no less than 10 days prior to the meeting.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

55. Pursuant to Section 7.3 of the Operating Agreement, at all relevant times, Spoto had a duty to ensure that all participants in any telephonic members meeting were able to hear each other and communicate in real time during the meeting.

56. Pursuant to Section 13.10 of the Operating Agreement, entitled "Severability," if any provision of the Operating Agreement is invalid or unenforceable, the remaining provisions will be unaffected.

57. Pursuant to Section 13.12 of the Operating Agreement, the Members and the Company are entitled to seek injunctive relief and other appropriate and equitable relief.

58. Pursuant to 13.4 of the Operating Agreement, the prevailing party is entitled to its expenses, including reasonable fees and expenses of attorneys, whether incurred at trial or on appeal in any action to interpret or enforce any provision of the Operating Agreement.

59. In addition to the Operating Agreement, Smiley drafted a Membership Tender Agreement and Agreement Adding New Member for the Company (together, the "Investor Agreements"). Attached hereto as Exhibit 3 and incorporated herein by reference are true and correct copies of the Investor Agreements.

60. The Membership Tender Agreement contemplated the addition of multiple new members to the Company with the following language: "[*Each time a new member is added the listing should include all prior members*]."

61. The Membership Tender Agreement listed the parties as: "The Farmington Industries Trust, by and through its trustee, Chris Spoto (the "tendering member")" and the Company.

62. Smiley had actual knowledge that Callahan and/or Spoto were giving the Investor Agreements to prospective members of the Company to solicit money in exchange for an interest in the Company.

63. Beginning in the spring of 2016, Callahan spent considerable time seeking new

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1  investors for the Company.

2  64.    Callahan contacted friends and family in an effort to raise capital for the
3  Company.

4  65.    Callahan presented some potential "friends and family" investors with Smiley's
5  corporate documents, including the Operating Agreement and the Investor Agreements,
6  all of which reference the Trusts.

7  66.    Over the course of approximately the next six months, the Company raised
8  approximately $306,000.00 in new capital, including $251,000 raised directly or
9  indirectly by Callahan.

10  67.    On or about May 5, 2016, Plaintiff Jennifer Andlovec contributed $7,500.00 to
11  the Company in exchange for a 0.25% interest. Plaintiff Jennifer Andlovec signed
12  Smiley's corporate documents reflecting the existence of the Trusts purportedly putting
13  control of the Company in Spoto's hands exclusively.

14  68.    On or about May 5, 2016, Plaintiff Shamus Ryan contributed $7,500.00 to the
15  Company in exchange for a 0.25% interest. Plaintiff Shamus Ryan signed Smiley's
16  corporate documents reflecting the existence of the Trusts purportedly putting control of
17  the Company in Spoto's hands exclusively.

18  69.    On or about May 31, 2016, Plaintiffs Nathan and Kiley Lazarus contributed
19  $16,000.00 to the Company in exchange for a .5333% interest. Plaintiffs Nathan and
20  Kiley Lazarus signed Smiley's corporate documents reflecting the existence of the Trusts
21  purportedly putting control of the Company in Spoto's hands exclusively.

22  70.    On or about June 3, 2016, Plaintiff Philip Jones contributed $30,000.00 to the
23  Company in exchange for a 1% interest. Plaintiff Philip Jones signed Smiley's corporate
24  documents reflecting the existence of the Trusts purportedly putting control of the
25  Company in Spoto's hands exclusively.

26  71.    On or about June 28, 2016, Plaintiffs Gary and Nancy Lazarus, in their capacity

Page 9 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

as Trustees of the Edwards Lazarus Family Trust Dated 1994, contributed $30,000.00 to the Company in exchange for a 1% interest. Plaintiffs Gary and Nancy Lazarus, in their capacity as Trustees of the Edwards Lazarus Family Trust Dated 1994, signed Smiley's corporate documents reflecting the existence of the Trusts purportedly putting control of the Company in Spoto's hands exclusively.

72.    On or about July 14, 2016, Plaintiff Julia Rae Sanderson contributed $30,000.00 to the Company in exchange for a 1% interest. Plaintiff Julia Rae Sanderson signed Smiley's corporate documents reflecting the existence of the Trusts purportedly putting control of the Company in Spoto's hands exclusively.

73.    On or about July 19, 2016, Plaintiff Hiromi Heider contributed $30,000.00 to the Company in exchange for a 1% interest. Plaintiff Hiromi Heider signed Smiley's corporate documents reflecting the existence of the Trusts purportedly putting control of the Company in Spoto's hands exclusively.

74.    On or about September 2, 2016, Plaintiff Richard Brown DeWitt contributed $10,000.00 to the Company in exchange for a .3333% interest. Plaintiff Richard Brown DeWitt signed Smiley's corporate documents reflecting the existence of the Trusts purportedly putting control of the Company in Spoto's hands exclusively.

75.    On or about September 20, 2016, Plaintiff Harold Robinson contributed $5,000.00 to the Company in exchange for a .16667% interest. Plaintiff Harold Robinson signed Smiley's corporate documents reflecting the existence of the Trusts purportedly putting control of the Company in Spoto's hands exclusively.

76.    Plaintiffs have contributed a total of $166,000.00 to the Company in exchange for an interest of approximately 5.533% in the Company.

77.    Plaintiffs' contributions to the Company were based on a stated valuation of the Company between $2,970,000.00 and $3,000,000.00.

78.    In or around November of 2016, Spoto and Callahan communicated with Kevin

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

Kahmann ("Kahmann") about Kahmann's potential investment in the Company.

79.     Upon information and belief, Kahmann's hometown is Minnesota, and he is engaged in an employment relationship with Spoto's wife.

80.     Upon information and belief, in or around November of 2016, Kahmann loaned Spoto's family $15,000.00 (the "Loan") when Spoto was struggling.

81.     On or about November 27, 2016, Spoto, on behalf of himself and Callahan, wrote to Kahmann via e-mail with three proposed financing scenarios for the Company (the "11/27 E-mail"). Attached hereto as Exhibit 4 and incorporated herein by reference is a true and correct copy of the 11/27 E-mail.

82.     In the 11/27 E-mail, Spoto advocated for what he termed the Company's "strongest option," i.e., raise $195,000 and build two flower rooms ("Spoto's Strongest Option").

83.     In response, Kahmann proposed the following offer (the "Kahmann Offer"):

> a.     Kahmann would raise $300,000.00 of capital to sell 10% of the Company to other investors he claimed to know; and
>
> b.     Kahmann would contribute $120,000.00 himself, which would include the Loan to Spoto's family, in exchange for a 15% interest in the Company.

84.     Callahan objected to the Kahmann Offer on behalf of the Members because it was based on a substantially reduced valuation of the Company and benefited Kahmann at the expense of the Members, to whom Spoto owed fiduciary duties.

85.     Callahan expressed additional concerns to Spoto regarding Kahmann for the following non-exhaustive list of reasons: (a) Kahmann's business had filed for bankruptcy in 2008 in Minnesota; (b) Kahmann had a recent $51,000.00 judgment entered against him in Oregon; and (c) Kahmann had recently defaulted on a credit card.

86.     Upon information and belief, Spoto was aware of Kahmann's troubled financial history.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

87. Spoto rejected Callahan's concerns regarding Kahmann's background and the inequity that would befall the Members and advocated intently for the Kahmann Offer.

88. On or about December 25, 2016, Callahan proposed funding the Company with a firm commitment of $180,000.00, in addition to a commitment to raise more capital, consistent with Spoto's Strongest Option (the "Callahan Offer").

89. In addition to the Callahan Offer, Callahan proposed various solutions to the increasingly frayed tensions between Spoto, on the one hand, and Callahan and the Members, on the other, including a buyout offer for Spoto and an offer to attend mediation, both of which Spoto rejected.

90. On or about December 30, 2016, Callahan, in his capacity as the holder of a purported 40% beneficial ownership interest in the Company, wrote to Smiley via e-mail to express concerns about the state of the Company. Smiley did not respond to Callahan.

91. Despite a request to do so by Callahan, Spoto refused to present the Kahmann Offer to Plaintiffs to consider and vote on it.

92. Spoto refused to give Plaintiffs the opportunity to invest in the Company using the same valuation upon which the Kahmann Offer was based.

93. From around November 2016 through February 2017, Spoto repeatedly told Callahan that he had concerns about the security of his wife's job.

94. In or around late January 2017, 120 out of 140 of the Company's most valuable plants or "mother plants" were allegedly stolen from the Premises (the "Alleged Theft").

95. Upon information and belief, although the police were called, the City of Bend Police Department found no evidence of a crime on the Premises.

96. Upon information and belief, around the time of the Alleged Theft, a vehicle and a trailer with Minnesota license plates were parked on or around the Premises.

97. Following the Alleged Theft, Callahan offered to and was ready, willing, and able to replace the allegedly stolen plants.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

98.     Spoto did not accept Callahan's offer to replace the plants taken during the Alleged Theft, stating that the Company now was worthless despite having a lease on a newly built-out facility and an application on file with the Oregon Liquor Control Commission ("OLCC") for a recreational producer's license.

99.     Landlord and Spoto executed a Lease Termination Agreement (the "Lease Termination"), dated to be effective on February 1, 2017, whereby the Company's lease of the Premises terminated that same day. Upon information and belief, the Lease Termination was not signed on February 1, but perhaps close to two weeks later. Attached hereto as Exhibit 5 and incorporated herein by reference is a true and correct copy of the Lease Termination.

100.    Upon information and belief, Smiley negotiated the terms of the Lease Termination with counsel for Landlord and personal counsel for Spoto on or about February 13, 2017. Although Smiley had been repeatedly contacted by counsel for Callahan and the Plaintiffs, neither Callahan nor the Plaintiffs was included in any of the deliberations about terminating the Company's Lease, which is tantamount to giving away all the money invested by Callahan and the Plaintiffs to build the improvements.

101.    Upon information and belief, Smiley drafted the Lease Termination.

102.    Spoto allegedly told the Landlord of the Premises that the Company was insolvent and could no longer pay rent for the Premises, as stated in the Lease Termination.

103.    Pursuant to the Lease Termination, Spoto paid a "termination fee," consisting only of Landlord's attorney fees for drafting a new lease.

104.    Pursuant to the Lease Termination, Spoto requested that Landlord return the $15,000.00 security deposit paid by the Company to Spoto.

105.    Storm 3 executed a commercial lease for the Premises with an effective date of February 1, 2017 (the "Storm 3 Lease"). Attached hereto as Exhibit 6 and incorporated herein by reference is a true and correct copy of the Storm 3 Lease.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

106. Under the Storm 3 Lease, the rent is $5,665.00 for the first 20 months and $6,000.00 for the second 20 months of the Lease term.

107. The Storm 3 Lease was executed by Valerie Kahmann ("Mrs. Kahmann"), who also executed a personal guaranty.

108. Upon information and belief, Valerie Kahmann is married to Kevin Kahmann, the employer of Spoto's wife.

109. Upon information and belief, Kevin Kahmann has a financial interest in Storm 3, along with his wife, the guarantor under the Storm 3 Lease.

110. The Storm 3 Lease lists only the address of Spoto's attorney, Jennifer Clifton ("Clifton"), as its business address. It is unclear if Clifton also represents Storm 3 with respect to this matter.

111. Five days *after* the effective date of the Lease, on or about February 6, 2017, Clifton registered Storm 3 LLC with the Oregon Secretary of State.

112. Clifton is listed as both the organizer and registered agent of Storm 3.

113. Clifton's address is listed as the mailing address for Storm 3.

114. The filed Articles of Organization for Storm 3 list no member names or addresses other than the name and address of Clifton.

115. Upon information and belief, Spoto has a "financial interest" in Storm 3 LLC under OAR 845-025-1000 and for other purposes as well.

116. On or about February 14, 2017, Spoto sent the Members a Notice of Meeting of the Members of Farmington Industries, LLC, for February 24, 2017 ("Meeting"), in order to attempt to dissolve the Company. Attached hereto as Exhibit 7 and incorporated herein by reference is a true and correct copy of the Notice of Meeting of the Members of Farmington Industries, LLC (the "Dissolution Meeting Notice").

117. Spoto failed to provide Callahan with a copy of the Dissolution Meeting Notice.

118. Spoto stated in the Dissolution Meeting Notice that he was the holder of 80% of

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1    the Company.

2    119.    The Dissolution Meeting Notice references Spoto's disagreement with "Jeff

3    Callahan" regarding a "local venture capital group."

4    120.    The Dissolution Meeting Notice omits any reference to Callahan having any

5    interest in the Company.

6    121.    Members were provided a dial-in number and access code to participate in the

7    Meeting by telephone if they could not travel to Bend.

8    122.    As Manager of the Company, Spoto led the Meeting.

9    123.    During the Meeting,  Spoto employed technology to prevent the Members from

10    hearing each other or communicating with each other in real time.

11    124.    Spoto voted to dissolve the Company on February 24, 2017, over the objections

12    on the record of Plaintiffs. Spoto stated that the basis for him being able to carry the vote

13    was his control of 80% of the Company through the Trusts.

14    125.    On or around March 6, 2017, Plaintiffs and Callahan learned, for the first time,

15    that Smiley had never drafted the Trusts and that, if the Trusts ever existed in the first

16    place, there was no clear and convincing evidence as to their actual terms to prevent them

17    from failing for indefiniteness and/or other reasons.

18                              **FIRST CLAIM FOR RELIEF**
                                **(Breach of Fiduciary Duty)**
19                                **(Christopher Spoto)**

20

21    126.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 125 as if

22    fully set forth herein.

23    127.    Spoto breached his duties of care and loyalty to the Company and the Members

24    when he zealously advocated for the Kahmann Offer, which was based on an

25    inappropriately reduced valuation of the Company that benefitted Kahmann, his wife's

26    boss, at the expense of the Members.

Page 15 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

128.    Spoto had a duty to the Company and the Members of the Company to not advocate for a reduced valuation of the Company and, thus, the Members' membership interests.

129.    Spoto breached his duties of care and loyalty to the Company and the Members when he rejected the Callahan Offer, to the detriment of the Company and its Members.

130.    Spoto breached his duty of loyalty to the Company and the Members when he rejected Callahan's offer to continue on with the business of the Company including, but not limited to, replacing the plants lost in the Alleged Theft.

131.    Spoto breached his duties of care and loyalty by relying on the Alleged Theft as the basis for Spoto's decision to dissolve the Company.

132.    Spoto violated his duties of care and loyalty to the Company and the Members by forcing the Company to breach the Lease and telling the Landlord the Company was "insolvent" so the Lease could be terminated for the benefit of Spoto, Storm 3, and the Kahmanns.

133.    Spoto violated his duty of loyalty to the Company and the Members when he terminated the Lease and attempted to secure the return of the Company's $15,000.00 security deposit to Spoto personally, instead of to the Company, when Spoto was required to account to the Company and hold any refunded security deposit as trustee for the Company.

134.    Spoto violated his duty of loyalty to the Company and the Members when he terminated the Lease and, acting in his own self-interest and to the detriment of the Company and the Members, negotiated a release from his Personal Guaranty.

135.    Spoto violated his duty of loyalty to the Company and the Members when he negotiated the Lease Termination for the Company simultaneously with the execution of the Storm 3 Lease because Spoto was required to refrain from competing with the Company in conducting Company's business prior to the Company's dissolution.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

136.   Spoto violated his duty of care and loyalty to the Company and the Members when he voted to dissolve the Company on February 24, 2017.

137.   Spoto's breaches of his fiduciary duties of care and loyalty to the Company and the Members caused the Company to be unable to satisfy its financial obligations including, but not limited to, the Lease and the OLCC licensing process.

138.   Spoto's breach of his fiduciary duty as alleged above has caused the Company and the Members damages in an amount, reflected by, at a minimum, their actual, out-of-pocket investments of money in the Company, currently believed to be not less than $181,000.00, to be proven with further specificity at trial and subject to interest at the statutory rate of 9.00% per annum.

139.   Pursuant to Section 13.4 of the Operating Agreement, the prevailing party is entitled to its expenses, including reasonable attorney's fees and expenses, whether incurred at trial or on appeal in any action to interpret or enforce any provision of the Operating Agreement.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract)
### (Christopher Spoto)

140.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 139 as if fully set forth herein.

141.   Spoto willfully and materially breached Section 6.2 of the Operating Agreement when he failed to provide notice to Callahan, a member of the Company, of the Meeting at which Spoto moved to dissolve the Company.

142.   Spoto willfully and materially breached Section 7.3 of the Operating Agreement on February 24, 2017 when he employed technological measures to prevent Members from hearing each other and communicating in real time during the Meeting.

143.   Spoto's breach of the Operating Agreement, the non-severed clauses of which are a contract that can be enforced against Spoto, caused the Company and the Plaintiffs to

Page 17 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1   sustain damages.

2   144.    Pursuant to Section 13.4 of the Operating Agreement, the prevailing party is

3   entitled to its expenses, including reasonable attorney's fees and expenses, whether

4   incurred at trial or on appeal in any action to interpret or enforce any provision of the

5   Operating Agreement.

### THIRD CLAIM FOR RELIEF
#### (ORS 28.010 *et seq.* – Declaratory Judgments Act)
#### (Christopher Spoto)

8   145.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 144 as if

9   fully set forth herein.

10  146.    Pursuant to ORS 28.010, the Court shall have power to declare rights, status, and

11  other legal relations, whether or not further relief is or could be claimed. The declaration

12  may be either affirmative or negative in form and effect, and such declarations shall have

13  the force and effect of a judgment.

14  147.    On February 24, 2017, Spoto held the Meeting in violation of the terms of the

15  Operating Agreement when he failed to notice all of the true members of the Company

16  and when he prevented the Members in attendance from hearing each other or

17  communicating in real time.

18  148.    During the Meeting, Spoto moved to dissolve the Company and purported to vote

19  an 80% interest in the Company, in stated reliance on the Trusts.

20  149.    Plaintiffs seek a decree from this Court that the February 24, 2017 vote to

21  dissolve the Company was void and of no legal force or effect.

22  150.    Pursuant to Section 13.10 of the Operating Agreement, Plaintiffs additionally seek

23  a decree that Section 2 of the Operating Agreement is void and shall be severed from the

24  Operating Agreement because the Trusts referenced in Section 2 do not exist (and even if

25  they do, no one knows their material terms so they should fail anyway). The fraudulent

26  provisions of the Operating Agreement should be severed, and Plaintiffs should be

Page 18 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1  entitled to the benefit of their bargain to the extent possible. As such, Section 2 should be

2  replaced with a provision simply stating that Spoto and Callahan each own 40% of the

3  Company and the each of the Plaintiffs has an interest corresponding to his or her pro rata

4  contribution to the Company as alleged above.

5  151.    Pursuant to Section 13.4 of the Operating Agreement, the prevailing party is

6  entitled to its expenses, including reasonable attorney's fees and expenses, whether

7  incurred at trial or on appeal in any action to interpret or enforce any provision of the

8  Operating Agreement.

9  **FOURTH CLAIM FOR RELIEF**
   **(Avoidance of Fraudulent Transfer under ORS Ch. 95)**
10 **(Christopher Spoto; Storm 3 LLC)**

11 152.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 151 as if

12 fully set forth herein.

13 153.    Upon information and belief, Kahmann in engaged in some sort of employment

14 relationship with Spoto's wife.

15 154.    Kahmann knew from previous communications with the Company that the

16 Company needed money.

17 155.    Upon information and belief, Kahmann loaned Spoto's family $15,000.00 in or

18 around November 2016.

19 156.    Kahmann had actual knowledge about the Company's extensive and costly

20 improvements to the Premises, paid for with Plaintiffs' money.

21 157.    The Lease Termination and the Storm 3 Lease are both dated February 1, 2017,

22 though neither is believed to have actually been signed that day.

23 158.    Spoto received a fraudulent transfer when he effectuated the Lease Termination

24 and received, in exchange, a release from his Personal Guaranty from Landlord.

25 159.    The Company did not receive anything of value in exchange for Spoto being

26 released from the Personal Guaranty making it a transfer for less than reasonably

Page 19 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

EXHIBIT 1, Page 19 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

equivalent value at a time when the Company was engaged or was about to engage in a business or a transaction for which the remaining assets of the Company were unreasonably small in relation to the business or transaction; and/or intended to incur, or believed or reasonably should have believed that the Company would incur, debts beyond the Company's ability to pay as they become due.

160.     Because the Lease Termination was intended to defraud, hinder or delay the Members, who are creditors under ORS Ch. 95, the Lease Termination and concomitant release of the Personal Guaranty, is actually fraudulent in addition to constructively fraudulent.

161.     The Lease Termination and Personal Guaranty release are "transfers" under ORS Ch. 95.

162.     Spoto is an "insider" under ORS Ch. 95.

163.     The Storm 3 Lease is a fraudulent transfer by Storm 3 because Storm 3 received the benefit of the improvements paid for by the Company without the Company receiving any reasonably equivalent value in return at a time when the Company was engaged or was about to engage in a business or a transaction for which the remaining assets of the Company were unreasonably small in relation to the business or transaction; and/or intended to incur, or believed or reasonably should have believed that the Company would incur, debts beyond the Company's ability to pay as they become due.

164.     Storm 3 was an "insider" with respect to the Company.

165.     Upon information and belief, the reasonably equivalent value of the Premises far exceeds $5,665.00 per month, given the extensive improvements made by the Company with Plaintiffs' money.

166.     Upon information and belief, the purpose of Spoto terminating the Lease was to:

a.     Make the improved Premises available for lease by an entity in which the Members had no interest;

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

b. Induce the Landlord to release Spoto from the Personal Guaranty;

c. Transfer the Premises to Storm 3, an entity registered five days *after* the effective date of the Storm 3 Lease and controlled by Kahmann and formed by Clifton, Spoto's personal attorney; and

d. Benefit himself and his wife personally, to the direct detriment of Plaintiffs and Callahan, by getting released from the Personal Guaranty ("Personal Guaranty Release") and orchestrating the usurpation by Storm 3 of the Company's improvements and expectancy of an OLCC production license.

167. Two weeks after the back-dated Effective Date of the Lease Termination and New Lease, Spoto mailed the Dissolution Meeting Notice to Members (excluding Callahan), explaining that he wished to dissolve the Company at a meeting to be held on February 24, 2017.

168. Plaintiffs seek to have this Court adjudge that the Lease Termination, the Personal Guaranty Release, and the Storm 3 Lease ("Transfers") are fraudulent transfers under ORS Ch. 95 and that one or more of the following remedies are appropriate: (i) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim; (ii) an attachment or other provisional remedy against the asset transferred or other property of the transferee; (iii) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property; (iv) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; and/or (v) any other relief the circumstances may require.

169. Pursuant to Section 13.4 of the Operating Agreement, the prevailing party is entitled to its expenses, including reasonable attorney's fees and expenses, whether incurred at trial or on appeal in any action to interpret or enforce any provision of the Operating Agreement.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

## FIFTH CLAIM FOR RELIEF
### (Expulsion of Member)
### (Against Christopher Spoto)

170.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 169 as if fully set forth herein.

171.    Upon application of any member, the Court may order the expulsion of a member of a limited liability company pursuant to ORS 63.209.

172.    Spoto's wrongful conduct as alleged above has adversely and materially affected the business operation or affairs of the Company by depriving the Company of the benefit of its assets and diminishing the Company's assets.

173.    Spoto has willfully or persistently breached his fiduciary duties owed to the Company and the Members to the extent that it is not reasonably practicable to carry on the business or affairs of the Company with Spoto as a Member of the Company.

174.    Because of the foregoing conduct, Spoto should be expelled as a Member from the Company.

175.    Pursuant to ORS 63.209, distributions, if any, owed to Spoto should be offset by any damages incurred by the Company and/or Members or amounts already wrongfully taken by him.

176.    Pursuant to Section 13.4 of the Operating Agreement, the prevailing party is entitled to its expenses, including reasonable attorney's fees and expenses, whether incurred at trial or on appeal in any action to interpret or enforce any provision of the Operating Agreement.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting)
### (David Smiley, P.C. and David Smiley)

177.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 176 as if fully set forth herein.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1    178.    Upon information and belief, Smiley was aware of and participated in the

2    breaches of Spoto's fiduciary duties to the Company and the Members.

3    179.    Upon information and belief, Smiley aided and abetted Spoto in his breaches of

4    fiduciary duty to the Company and the Members by:

5              a.    Playing an active role in the dissemination and perpetuation of the myth

6                    that Smiley had created the Trusts and that the Company was properly

7                    governed by the Trusts in addition to the Operating Agreement, a myth

8                    upon which Plaintiffs and Callahan relied to their detriment for the better

9                    part of a year;

10             b.    Playing a material role in devising a strategy whereby the Lease could be

11                   terminated in a way least likely to be susceptible to challenge by the

12                   Members; and

13             c.    Drafting documents, purportedly on behalf of the Company, whereby

14                   Spoto was released from his Personal Guaranty and the Company's

15                   security deposit was returned to Spoto instead of the Company, all to the

16                   detriment of the Company and the Members.

17                        **SEVENTH CLAIM FOR RELIEF**
                          **(Fraudulent Misrepresentation)**
18              **(Christopher Spoto, David Smiley, P.C. and David Smiley)**

19   180.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 179 as if

20   fully set forth herein.

21   181.    Smiley made material and false representations to Callahan and the Members

22   when he stated and/or implied that the Trusts existed and that Smiley had drafted the

23   relevant trust instruments.

24   182.    Based on information and belief, Spoto had actual knowledge that the Trusts did

25   not exist.

26   183.    Smiley's misrepresentations were material because, pursuant to the Operating

Page 23 – COMPLAINT

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

EXHIBIT 1, Page 23 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

Agreement that he drafted, the Trusts were the sole Members of the Company.

184. Smiley intended for or should have known that Callahan and the Members would rely upon his false and material representations.

185. Smiley drafted the Investor Agreements for the sole purpose of the Company giving them to investors to solicit money from them to invest in the Company.

186. The Investor Agreements and the Operating Agreement all referenced the Trusts, which did not exist and were never created by Smiley but that Smiley pretended existed, for months and months on end, knowing full well that the Members did not legally have to be oppressed by the structure of the Trusts since he never formed them.

187. Smiley knew or should have known that material and false representations would be conveyed to third parties and that third parties would be relying upon his material false representations.

188. Callahan was ignorant of the falsity of Smiley's material misrepresentations, in large part, because neither Smiley nor Spoto would truthfully or cooperatively share information about the Trusts, and, as a result, conveyed Smiley's material misrepresentations to Plaintiffs.

189. Plaintiffs were ignorant of the falsity of Smiley's material misrepresentations to Callahan when they considered whether to invest in the Company.

190. Plaintiffs would not have invested in the Company had they known that the material representations of Smiley were false and that the Company had been set up essentially as a ruse for giving Spoto complete control of Plaintiffs' money.

191. Plaintiffs' reliance on the false and material representations of Smiley was justified.

192. As the direct and foreseeable result of Smiley's false and material misrepresentations, Plaintiffs have suffered economic damages in an amount not less than $166,000.00 and to be proven with further specificity at trial.

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment to be entered granting them relief as follows:

A. An award of damages against Christopher Spoto in an amount to be proven at trial, but currently believed to be not less than $181,000.00, subject to interest at the statutory rate of 9.00% per annum;

B. Pursuant to ORS 28.010, a judgment and decree that Section 2 of the Operating Agreement is void and shall be severed from the Operating Agreement because the Trusts referenced in Section 2 were never created and do not exist. As such, Section should be 2 be replaced whereby Spoto and Callahan each own 40% of the Company and each of the Plaintiffs has an interest corresponding to his or her contribution to the Company as alleged above;

C. A declaration and judgment that the Termination of Company's Lease, the Personal Guaranty Release, and the Storm 3 Lease are avoided as fraudulent transfers for the benefit of the Company and the Members;

D. A declaration and judgment that the February 24, 2017 vote to dissolve the Company was void;

E. Expulsion of Christopher Spoto as a Member of the Company;

F. An award of damages against David Smiley, P.C. and David Smiley in an amount to be proven at trial, but currently believed to be not less than $166,000.00, subject to interest at the statutory rate of 9.00% per annum;

G. An award of prevailing party fees to Plaintiffs for their reasonable expenses, including attorney's fees, pursuant to Section 13.4 of the Operating Agreement;

///

///

///

EMERGE LAW GROUP
805 SW Broadway, Suite 2400
Portland, OR 97205
(503) 227-4525

1   H. An award of Plaintiffs' costs and disbursements pursuant to ORCP 68; and

2   I. Such other and further relief as the court deems just and equitable.

3

4   DATED: March 14, 2017.          RESPECTFULLY SUBMITTED,

5                                   s/ Matthew A. Goldberg
6                                   Matthew A. Goldberg, OSB 052655
                                    matt@emergelawgroup.com
7                                   Allison C. Bizzano, OSB 052014
                                    allison@emergelawgroup.com
8                                   Emerge Law Group
                                    805 SW Broadway, Suite 2400
9                                   Portland, Oregon 97205
                                    Tel: (503) 227-4525
10                                  Attorneys for Plaintiffs

11                                  Trial Attorney: Matthew A. Goldberg, OSB 052655
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 26 – COMPLAINT

## OPERATING AGREEMENT

**DATE:**     April 29, 2016

**PARTIES:**    Chris Spoto Revocable Trust, and Farmington Industries Trust

### RECITAL:

The parties to this agreement (the "members") are entering into this agreement for the purpose of forming a limited liability company (the "company") comprised of the members that is to be managed by one or more managers (the "managers") and restating the company's operating agreement under the Limited Liability Company Act of the state of Oregon (the "act").

### AGREEMENTS:

1. **Formation**

    1.1  **Name**. The name of the company is Farmington Industries LLC.

    1.2  **Articles of Organization**. Articles of organization for the company were filed with the secretary of state for the state of Oregon on October 9, 2014.

    1.3  **Duration**. The company will exist until dissolved as provided in this agreement.

    1.4  **Principal Office**. The company's principal office will initially be at 195 SE 3rd Street, Bend, Oregon 97702, USA, but it may be relocated by the managers at any time.

    1.5  **Designated Office and Agent for Service of Process**. The company's initial designated office will be at 195 SE 3rd Street, Bend, Oregon 97702, and the name of its initial agent for service of process at that address will be Chris Spot. The company's designated office and its agent for service of process may only be changed by filing a notice of the change with the secretary of state for the state in which the articles of organization of the company were filed.

    1.6  **Purposes and Powers**. The company is formed for the purpose of engaging in the business of the development and exploitation of specialty agricultural crops and controlling the benefits of that exploitation. The company has the power to do all things necessary, incident, or in furtherance of that business.

    1.7  **Title to Assets**. Title to all assets of the company will be held in the name of the company. No member has any right to the assets of the company or any ownership interest in those assets except indirectly as a result of the member's ownership of an interest in the company. No member has any right to partition any assets of the company

1 - Operating Agreement

or any right to receive any specific assets on the winding up of the company's business or on any other distribution from the company. Assets of the company may not be commingled with those of a member or any other person.

## 2. Members, Contributions and Interests

**2.1** **Members**. The initial member of the company was Chris Spoto, held interests in trust on behalf of the following members, and which are now vested to said members as follows:

| Name and Address | Contribution | Ownership Interest | Profits Interest |
|---|---|---|---|
| Chris Spoto Revocable Trust by and through its Trustee Chris Spoto 195 SE 3rd Street, Bend, Oregon 97702 | See **Exhibit** A attached here to and made a part hereof. | 80.0% | 80.0% |
| Farmington Industries Trust, by and through its Trustee Chris Spoto 195 SE 3rd Street, Bend, Oregon 97702 | See **Exhibit** A attached here to and made a part hereof. | 20.0% | 20.0 % |

**2.2** **Initial Capital Contributions**. The capital contributions of the members have been previously made and will be made as specified in **Exhibit A.**

**2.3** **Additional Members.**

**2.3.1** Additional members of the company may be admitted with the consent of the managers if the managers have approved additional capital contributions, the members have not contributed the maximum amount of such contributions, and the additional members do not contribute any more capital than the difference between the maximum set by the managers and the amount contributed by the members.

**2.3.2** Additional members of the company may be admitted with the consent of the managers if the managers have approved additional capital contributions, the membership received by the members originates, and equates to membership returned to the company by the Farmington Industries Trust, as may occur from time to time, in such amounts as its trustees determine and the managers agree to receive and distribute. No other approval is necessary, and the members consent that the manager may receive such interest retired by the trustees for no consideration, and may issue such ownership interests to members, including new members, for such consideration or incentive or for no consideration as the managers may determine, and any such interests not utilized by the managers

**2 - Operating Agreement**

may be subsequently distributed to the trust beneficiaries without triggering a right of the company or the members to have any option against the same. All members covenant to elect to continue the company under the resulting ownership created by exercise of this section by the company.

**2.3.2.1** All existing members of the company at the time the new member is brought on pursuant to this section agree that current combined value of the existing members' interests in the company specified by the managers, and that such value may not equal to the current aggregate total of the existing members' capital accounts that are shown on the company's books and records. In order to insure that the interests of the all members in the capital of the company is based on the value of their contributions at the date of this agreement, the existing members' capital accounts will be adjusted to reflect the current fair market value of their interest, effective on the date of this agreement. For all purposes under the operating agreement, the existing members will, following the date of this agreement, be deemed to have made contributions to the capital company in an amount equal to the current agreed fair market value of their interests.

**2.3.2.2** All existing members of the company at the time the new member is brought on pursuant to this section agree that the new member will be admitted as a member of the company effective on this date of this agreement. Unless the date of this agreement is the first day of fiscal year of the company, the income or loss of the company for the tax year in which the new member is admitted must be allocated between the new member and the existing members. This allocation may be made in any manner permitted under IRC §706(d)(1) as may be selected by action of the members of the company taken in accordance with the operating agreement.

**2.3.2.3** In any such exercise under this section, the existing members of the company consent to the admission of the new member as a member of the company pursuant to the powers vested to the managers of the company and agree that the new member will have all the rights and obligations of a member of the company. The existing members also approve and agree to the amendments to the operating agreement made under the terms of the agreement to reflect the new membership and amendments necessary to reflect the inclusion of the new member and the adjustment to their capital accounts to keep them in parity with their ownership interests percentages.

**2.3.3** Additional members may also be admitted under the section of this agreement relating to substitution. Otherwise, additional members may not be admitted except with the members' unanimous approval.

# 3 - Operating Agreement

**2.4**     **Additional Contributions**. Except as otherwise provided in the act, no member is required to contribute additional capital to the company without the member's consent. Additional capital contributions to the company may be made by the members only with the approval of the managers. If the managers approve additional capital contributions, the managers must set a maximum amount of such contributions that will be accepted from the members and must determine whether the contributions will affect the members' ownership interests, and if so, what the effect will be. If ownership interests will be affected, the members must approve the additional capital contributions and the effect on ownership interests before additional contributions may be accepted. If additional capital contributions are to be accepted, each member will have the right, but not the obligation, to contribute a pro rata share of the maximum based on the member's ownership interest. If any member elects to contribute less than the member's pro rata share of the maximum, the other members may contribute the difference on a pro rata basis in accordance with their ownership interests or on any other basis on which they may agree.

**2.5**     **No Interest on Capital Contributions**. No interest will be paid on capital contributions.

**2.6**     **Capital Accounts**. An individual capital account must be maintained for each member. A member's capital account will be credited with all capital contributions made by the member and with all income and gain (including any income exempt from federal income tax) allocated to the member. A member's capital account will be charged with the amount of all distributions made to the member and with all losses and deductions (including deductions attributable to tax-exempt income) allocated to the member. Members' capital accounts must be maintained in accordance with the federal income tax accounting principles contained in Treasury Regulations §1.704-1(b)(2)(iv).

**2.7**     **Adjustment of Capital Accounts**. If additional capital is contributed to the company by any existing or new member or if money or property is distributed by the company in liquidation of all or part of the interest of a member, the managers may elect to increase or decrease the capital accounts of all members to reflect a revaluation of the property of the company on its books. If an adjustment is made, it must be based on the fair market value of the property of the company at the time the adjustment is made and must reflect the way in which unrealized income, gain, loss, or deduction inherent in the property would be allocated between the members under the section of this agreement relating allocation of profits and losses. After an adjustment is made, members' distributive shares of depreciation, depletion, amortization, and gain and loss as computed for tax purposes must be determined taking into account the difference between the book value of the property of the company existing at the time the adjustment was made and the adjusted tax basis of the property under Treasury Regulations §1.704-1(b)(4)(i). In addition, the capital accounts of the members must be adjusted after the adjustment is made to reflect depreciation, depletion, amortization, and gain and loss the as determined for book purposes as required in Treasury Regulations §1.704-1(b)(2)(iv)(g).

**2.8**     **Outside Activities and Fiduciary Duties**. Members may engage in business and investment activities outside the company, and neither the company nor the other

**4 - Operating Agreement**

members have any rights to the profits or benefits of such activities. Except as otherwise provided in this section, no member owes any fiduciary duty to the company or the other members solely by reason of being a member of the company.

**2.9**     **Self Interest of Members**. A member does not violate any duty or obligation to the company merely as a result of engaging in conduct that furthers the interest of the member. A member may lend money or transact other business with the company, and, in this case, the rights and obligations of the member will be the same as those of a person who is not a member, so long as the loan or other transaction has been approved by the managers, or by the members if the member is manager. Unless otherwise provided by applicable law, a member with a financial interest in the outcome of a particular action is nevertheless entitled to vote on such action.

**2.10**    **Limited Liability.** Except as otherwise provided in the act, the member has no personal liability for any obligation, expense, or liability of the company, including the obligation to indemnify managers.

**2.11**    **Member Expenses.** No member is entitled to reimbursement of expenses except as reimbursed by the manager, after seeking approval of the members. However, if a member incurs expenses on behalf of the company, and is not reimbursed, the member may recognize such expenses on their own personal income tax returns.

**3.**     **Allocation of Profits and Losses**

**3.1**     **Determination**. The net profit or net loss of the company for each fiscal year will be determined according to the accounting principles employed in the preparation of the company's federal income tax information return for the year. In computing net profit or net loss for purposes of allocation among the members, no special provision will be made for tax-exempt or partially tax-exempt income of the company, and all items of the company's income, gain, loss, or deduction required to be separately stated under IRC §703(a) will be included in the net profit or net loss of the company.

**3.2**     **Allocation of Net Profits and Net Losses**. After giving effect to the special allocations set forth in the sections of this agreement relating to regulatory allocations, the net profits or net losses of the company for a fiscal year will be allocated among the members in proportion to their Profits Interests, as set forth in Section 2.1, above and Exhibit A, as they may change from time to time.

**3.3**     **Regulatory Allocations.** Notwithstanding the provisions of the section of this agreement relating to allocation of net profits and net losses:

**3.3.1**    No allocation of net losses of the company may be made to any member to the extent the allocation would cause the member to have an adjusted capital account deficit at the end of the fiscal year in which the allocation would otherwise be made. Any loss that cannot be allocated to a member under this section must be reallocated to the other members who do not have adjusted

**5 - Operating Agreement**

capital account deficits at the end of the fiscal year. The loss is to be reallocated to the other members in proportion to their ownership interests. For purposes of this section relating to regulatory allocations, an "adjusted capital account deficit" means a negative balance in a member's capital account after the capital account is increased by the amounts the member is deemed to be obligated to restore under Treasury Regulations §§1.704-2(g)(1) and 1.704-2(i)(5) (that is, the member's share of partnership minimum gain and the member's share of partner nonrecourse debt) and the capital account is reduced by the amounts described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), (5), and (6).

3.3.2   If any member receives any adjustments, allocations, or distributions described in Treasury Regulations §§1.704-1(b)(2)(ii)(d)(4), (5), or (6) causing the member to have an adjusted capital account deficit at the end of the fiscal year in which the adjustment, allocation, or distribution is made, the member must be specially allocated items of company income and gain (consisting of a pro rata share of each item of income or gain) in an amount and manner sufficient to eliminate the adjusted capital account deficit as quickly as possible. This subsection is intended to comply with the qualified income offset provisions of Treasury Regulations §1.704-1(b)(2)(ii)(d) and is to be interpreted in a manner consistent with those provisions.

3.3.2   The special allocations required under the preceding subsections are intended to comply with requirements of the treasury regulations. The members desire that, to the extent possible, all such special allocations be offset either with other additional special allocations or with special allocations of other items of company income, gain, loss, or deduction. If any allocation is made under the preceding subsections, offsetting allocations of company income, gain, loss, or deduction must be made in whatever manner the members reasonably determine appropriate so that, after such offsetting allocations are made, the capital account of each member is, to the extent possible, equal to the capital account the member would have had if the allocation under the preceding subsections had not been made. These offsetting allocations take priority over the allocations that would otherwise made under the section of this agreement relating to allocation of net profits and net losses.

3.4   **Allocations Solely for Tax Purposes**. In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to any property contributed to the capital of the company must be allocated among the members to take into account any variation between the adjusted basis of the property for federal income tax purposes in the hands of the company and the agreed value of the property as set forth in this agreement, or in any document entered into at the time an additional contribution is made to the company. Any elections or other decisions relating to the allocations to be made under this section will be made by the managers. The allocations to be made under this section are solely for purposes of federal, state, and local income taxes. They will not affect any member's capital account, allocable share of the net profits and net losses of the company, or right to distributions.

**6 - Operating Agreement**

3.5 **Prorates.** If a member has not been a member during a full fiscal year of the company, or if a member's ownership interest changes during a fiscal year, the net profit or net loss for the year will be allocated to the member based only on the period of time during which the member was a member or held a particular ownership interest. In determining a member's share of the net profit or net loss for a fiscal year, the net profit or net loss may be allocated ratably on a daily basis using the company's usual method of accounting. Except as otherwise provided in IRC §706(d)(3), the company's fiscal year may, in the alternative, be divided into two or more segments, and the net profits or net losses for each segment may be allocated among the persons who were members, or who held particular ownership interests, during each segment based upon their ownership interests during that segment.

## 4. Distributions

4.1 **Annual Distributions.** The company must make cash distributions to the members to enable them to pay taxes on income of the company. Specifically, the company must distribute during each fiscal year an amount equal to 40 percent of the taxable income of the company for that year. Distributions must be paid quarterly during at times that coincide to the extent possible with the members' payment of estimated taxes, and the amount of each distribution must be based on the anticipated taxable income of the company for the fiscal year of the distribution. The company's obligation to make distributions under this section is subject to the restrictions governing distributions under the act. Distributions shall be made to the members in proportion to the members' profits interest.

4.2 **Additional Distributions.** Subject to the restrictions governing distributions under the act, additional distributions of cash or property may be made by the company to the members, at such times and in such amounts as the members determine.

4.3 **Allocation of Distributions.** All annual distributions and additional distributions must be made to members in proportion to their profits interest.

## 5. Administration of Company Business

5.1 **Managers.** As provided in its articles of organization, the company will be managed by managers. The number of managers serving at any given time will be the number elected by the members, but the number may not be less than one or more than three. Managers may be entities as well as individuals and need not be members.

5.2 **Initial Managers.** The company will initially have one manager: Chris Spoto.

5.3 **Election and Term of Managers.** Managers will be elected at meetings of the members called for the purpose of electing managers. The notice of any meeting of members at which managers are elected must state that electing managers is a purpose of the

**7 - Operating Agreement**

meeting. Each manager, including each of the initial manager named in this agreement, will serve for a term ending at the next meeting of members called for the purpose of electing managers, or until the manager's earlier death, resignation, or removal.

5.4 **Resignation and Removal of Managers**. A manager may resign at any time by delivering a written resignation to the members. The resignation will be effective when received by all members unless the resignation specifies a later effective date. The members may remove any manager at any time, with or without cause. But a manager may be removed by the members only at a meeting of the members called for the purpose of removing the manager, and the notice of the meeting must state that removing a manager is a purpose of the meeting. The resignation or removal of a manager who is also a member will not constitute a withdrawal or expulsion of the manager as a member of the company or otherwise affect the manager's rights as a member.

5.5 **Authority of Managers.** The managers are vested with the exclusive authority to manage the company's business, and except as otherwise provided in this agreement, members have no right to participate therein unless they are also managers. All managers have the right to participate in the control and conduct of the company's business. Subject to the limitations imposed by this agreement or by action of the managers, each manager is an agent of the company and has authority to bind the company in the ordinary course of its business. For example, a manager may:

5.5.1 Expend the company's funds in the conduct of its business;

5.5.2 Sign and deliver all agreements and documents that are necessary or desirable to carry out the company's business, without additional signatures being required; and

5.5.4 Engage such persons as may be advisable to operate the company's business, after consulting with the members.

5.6 **Actions by Managers**. If there is more than one manager serving, all decisions requiring action of the managers or relating to the business or affairs of the company will be decided by the affirmative vote or consent of a majority of the managers. Managers may act with or without a meeting, and any manager may participate in any meeting by written proxy or by any means of communication reasonable under the circumstances.

5.7 **Approval of Members**. No manager has authority to do any of the following without the prior approval of the members:

5.7.1 To sell, lease, exchange, mortgage, pledge, or otherwise transfer or dispose of all or substantially all of the property or assets of the company;

5.7.2 To merge the company with any other entity;

5.7.3 To amend the articles of organization of the company or this agreement;

**8 - Operating Agreement**

**5.7.4**    To incur indebtedness by the company;

**5.7.5**    To change the nature of the business of the company; or

**5.7.6**    To commence a voluntary bankruptcy case for the company.

The managers may generally refer other matters to the members for approval but are not required to do so.

**5.8**    **Compensation and Reimbursement of Managers**. The managers will be paid such salaries and other compensation as may be fixed from time to time by the members, but such salaries may not exceed $ *200 K* per annum. The manager shall not be entitled to payment or compensation except as authorized by the members. Managers are not entitled to reimbursement from the company for expenses incurred on behalf of the company except as authorized by the members. However, if a manager incurs expenses on behalf of the company, and is not reimbursed, the manager may recognize such expenses on their own personal income tax returns.

**5.9**    **Outside Activities of Managers**. The managers must devote so much time and attention to the business of the company as they deem appropriate, consistent with their fiduciary duties. Managers are not expected to devote their full time to the business of the company, and except as otherwise provided in the section of this agreement relating to fiduciary duties of managers, they may engage in business and investment activities outside the company. Neither the company nor any member has any rights to the profits or benefits of such activities.

**5.10**    **Fiduciary Duties of Managers**. Each manager owes the fiduciary duties of care and loyalty to the company and the members and must discharge these duties and exercise the manager's rights in the company consistently with the obligation of good faith and fair dealing. Managers must discharge their fiduciary duties of care and loyalty to the company and to the members in accordance with the standards set forth in the section of this agreement relating to outside activities of managers as well as the following standards:

**5.10.1**    In conducting or winding up the company's business, a manager must act in a manner that the manager reasonably believes to be in the best interest of the company and must use the care that a person in like position would reasonably believe appropriate under the circumstances;

**5.10.2**    A manager must account to the company and hold as trustee for the company any profit or benefit derived by the manager in the conduct or winding up of the company's business or derived from use by the manager of the company's property, including the appropriation of a company opportunity;

**9 - Operating Agreement**

**5.10.3** Except as otherwise provided in the section of this agreement relating to self interest of managers, a manager must refrain from dealing with the company in the conduct or winding up of its business either personally or on behalf of a party having an adverse interest to the company; and

**5.10.4** A manager may not compete with the company in the conduct of its business of the company prior to the time the company is dissolved.

**5.11** **Self Interest of Managers**. A manager does not violate any duty or obligation to the company merely as a result of engaging in conduct that furthers the interest of the manager. A manager may lend money or transact other business with the company, and, in this case, the rights and obligations of the manager will be the same as those of a person who is not a manager, so long as the loan or other transaction has been approved or ratified by the members. Unless otherwise provided by applicable law, a manager with a financial interest in the outcome of a particular action is nevertheless entitled to vote on the action.

**5.12** **Indemnification**. The company may, by action of the managers and members, provide indemnification to managers and agents. The indemnification required in this section is not exclusive of that required by any statute, agreement, resolution of managers or the members, contract, or otherwise. However, notwithstanding any other provision of this agreement, the company shall not indemnify a manager, agent, or member for any liability arising out of: (a) a breach of the manager's fiduciary duties to the company or the members; (b) an act or omission not in good faith that involve intentional misconduct or a knowing violation of law; or (c) an unlawful distribution under the act.

## 6. Member Meetings

**6.1** **Meetings**. A meeting of members may be called by the managers or by members holding at least 30 percent of the ownership interests. If a meeting is called by members, the members give notice demanding a meeting to the managers, and the notice must state the purposes for which the meeting is to be held. Meetings of the members will be held at the principal office of the company, or at another place within 25 miles of the principal office that is fixed by action of the managers and is set forth in the notice of the meeting. All meetings of members shall provide for telephonic participation by members.

**6.2** **Notice of Meetings**. Notice of the date, time, and place of all meetings of members must be given to each member in writing not earlier than 60 days or less than 10 days before the meeting date. The notice must include a description of the purpose or purposes for which the meeting is called. The notice must be mailed to each member at the address for giving notice the member under the section relating to notice.

**6.3** **Record Date**. The members who are entitled to notice of a meeting of members and to vote at the meeting, and their respective ownership interests, must be determined as of the record date for the meeting. The record date may be selected by the managers and may not be more than 70 days nor less than 10 days before the meeting. If the managers

**10 - Operating Agreement**

do not select a record date, it will be the date on which the initial notice of the meeting was mailed to the members.

**6.4**  **Quorum and Voting.** A member may be represented at a meeting of members, and may vote, in person or by written proxy. The presence at a meeting of members, in person or by proxy, of members holding more than 50 percent of the ownership interests constitutes a quorum. Members are entitled to vote their ownership interests. Except as otherwise provided in the company's articles of organization, this agreement, or the act, a matter submitted to a vote at a meeting of the members will be approved if a majority of the ownership interests voted on the matter are voted in its favor.

## 7.  Action by Managers or Members

**7.1**  **Meetings Without Notice.** Notwithstanding any other provision of this agreement, if all of the managers or all of the members hold a meeting at any time or place and no manager or member objects to the lack of notice, the meeting will be valid even if there was no notice or the notice given was insufficient, and any action taken at the meeting will be the action of the managers or members, as the case may be.

**7.2**  **Actions Without Meeting.** Any action required or permitted to be taken by the managers or by the members at a meeting may be taken without a meeting if a written consent setting forth the action taken is signed by all of the managers or members, as the case may be. Written consents of the managers and members must be retained as part of the company's records of meetings.

**7.3**  **Meetings by Telephone.** Meetings of the managers or members may be held by conference telephone or by any other means of communication by which all participants can hear each other simultaneously during the meeting. If a manager or member participates in a meeting by conference telephone or by other means authorized by this section, the manager or member will be considered to be present at the meeting in person.

## 8.  Accounting and Records

**8.1**  **Books and Records.** The managers must keep such books and records relating to the operation of the company as are appropriate and adequate for the company's business and carrying out this agreement. At a minimum, the following must be maintained at the principal office of the company: (a) financial statements for the three most recent fiscal years; (b) federal, state, and local income tax returns for the three most recent fiscal years; (c) a register showing the names and current addresses of the members; (d) a copy of the company's articles of organization and any amendments; (e) this agreement and any amendments; (f) minutes of any meetings of managers or members; and (g) consents to action by managers or members. Each member will have access to all the company's books and records at all times.

**11 - Operating Agreement**

8.2    **Banking.** All funds of the company must be deposited in accounts in the company's name at such banks or savings and loan associations as the members determine. Funds may be withdrawn from the accounts on the signature of a person or persons designated by the members.

8.3    **Fiscal Year.** The fiscal year of the company will be the calendar year.

8.4    **Accounting Reports.** Within 90 days after the close of each fiscal year, the company must deliver to each member an unaudited report of the activities of the company for the fiscal year, including a copy of a balance sheet of the company as of the end of the year and a profit and loss statement for the year.

8.5    **Tax Returns.** The company must prepare and file on a timely basis all required federal, state, and local income tax and other tax returns. Within 90 days after the end of each fiscal year, the company must deliver a Schedule K-1 to each member showing the amounts of any income, gain, loss, deductions, or credits allocated to the member for the fiscal year.

8.6    **Tax Matters Partner.** Anytime the company has more than 10 members, any member is an entity other than an estate or a C corporation, or any member is a nonresident alien individual, the members must designate one of the members as the tax matters partner of the company in accordance with IRC §6231(a)(7) and keep this designation in effect at all times. In making this designation, preference must be given to members who are also managers.

9.    **Dissociation of Members**

9.1    **Withdrawal.** No member may withdraw from the company without the vote of the members.

9.2    **Events of Dissociation.** If a member who is an individual dies, a member who is an individual and is serving as a manager becomes incapacitated, a member which is an entity is dissolved or terminated, or any member becomes bankrupt, the member will be deemed to have dissociated from the company effective on the date the company has knowledge of the event (the "dissociation date").

9.2.1    A member-manager will be considered to be incapacitated if a guardian of the member's person or a conservator of the member's estate is appointed. A member-manager will also be considered to be incapacitated if the member has been unable to perform the essential functions of a manager of the company, with or without reasonable accommodation, for a consecutive period of 180 days, or it has been determined with reasonable medical certainty that the member will be unable to perform those functions for a consecutive period of 180 days.

**12 - Operating Agreement**

**9.2.2** A member will be considered bankrupt if: (a) the member makes an assignment for the benefit of creditors; (b) the member files a voluntary petition in bankruptcy; (c) the member is adjudicated as being bankrupt or insolvent; (d) the member files a petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, or dissolution for the member, or similar relief under any statute, law, or regulation; (e) the member files an answer or other pleading admitting or failing to contest the material allegations in any proceeding of the foregoing nature filed against the member, or the proceeding is not dismissed within 120 days after it is commenced; or (f) the member seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the member, or of all or any substantial part of the member's property, or the appointment of such a trustee, receiver, or liquidator without the member's consent is not vacated or stayed within 120 days after the appointment or after the expiration of the stay.

**9.3** **Effect of Dissociation**. Within 60 days after the dissociation date, except in the instance of death or disability, the company may elect to purchase the dissociating member's ownership interest by giving notice of the election to the dissociating member and all other members. If the election is not made by the company within the allowable 60-day period, one or more of the other members may elect to purchase the dissociating member's ownership interest by giving written notice to the dissociating member, the company, and the other members within 15 days after the 60-day period expires. If more than one member elects to make the purchase, the electing members have the right to purchase the interest pro rata in accordance with their ownership interests. No election to purchase a dissociating member's ownership interest will be effective unless the election is made by the company or the other members to purchase the dissociating member's entire interest—dissociating members are not required to sell part of their ownership interests. If neither the company nor the other members elects to purchase a dissociating member's ownership interest within the allowable time limits, the interest is available to be sold to any outside party, or upon the vote of the member, the company may be dissolved, and its business be wound up.

**9.4** **Purchase Price**. The purchase price of a dissociating member's ownership interest will be equal to the sum of (a) the dissociating member's capital account on the dissociation date plus (b) the product of (i) the difference between the net value of the company on the dissociation date and the aggregate amount of the capital accounts of all members on the dissociation date multiplied by (ii) the dissociating member's percentage ownership interest. The net value of the company may be determined by agreement between the dissociating member and the purchaser, whether the purchase is made by the company or other members. If an agreement on the value is not reached within 30 days following the election to purchase the dissociating member's interest, the net value of the company must be determined by a third party appraiser selected by the purchaser who is reasonably acceptable to the dissociating member. In determining the net value of the company, the appraiser must determine the difference between: (a) the greater of the liquidation value of the assets of the company or the value of the company's assets based on sale of the entire company as a going concern; and (b) the aggregate amount of both

**13 - Operating Agreement**

long and short term indebtedness and liabilities of the company. If the appraisal is not completed within 120 days following the election to purchase the dissociating member's interest, the dissociating member may apply to a court of competent jurisdiction for the appointment of another appraiser, in which case the court-appointed appraiser must determine the net value of the company in accordance with the standards set forth in this section, and the purchase price will be determined based on the value determined by that appraisal. The dissociating member must pay one-half of all appraisal costs, and the purchaser must pay the other half.

9.5 **Payment for Member's Interest**. Whether a dissociating member's ownership interest is purchased by the company or the other members, the purchase price for the interest must be paid as provided in this section.

9.5.1 The purchase price will bear interest from the dissociation date at the prime rate of interest in effect for that date as quoted in *The Wall Street Journal* or, if that publication is not available, another reputable national publication selected by the purchaser that is reasonably acceptable to the dissociating member.

9.5.2 The purchase price will be payable in accordance with the terms of a promissory note of the purchaser, or promissory notes of the purchasers if there is more than one. All promissory notes must provide for the payment of the principal amount in 60 equal monthly installments, including interest on the unpaid balance, with the first installment to be due one month after the date of closing and an additional installment to be due on the same day of each succeeding month until the promissory note is paid in full. Promissory notes will bear interest from the date of the closing at the rate specified in the preceding subsection. They must provide that if any installment is not paid when due, the holder may declare the entire remaining balance, together with all accrued interest, immediately due and payable. Partial or complete prepayment of the remaining balance due under a promissory note will be permitted at any time without penalty, but no partial prepayment will affect the amount or regularity of payments coming due thereafter.

9.5.3 Payment of all promissory notes will be secured by a security agreement in a form reasonably acceptable to the lawyer for the dissociating member. The security agreement must allow the ownership interest in the company that constitutes the collateral to be transferred if there is a default and the security interest is foreclosed or the interest is retained by the secured party in satisfaction of the secured indebtedness. The interest must be transferable in connection with a foreclosure or retention without the need for member approval or tender of the shares to the company or other members under the terms of this agreement, and the person to whom the ownership interest is transferred must be admitted as a member of the company without consent of the members being required. If the purchase is made by one or more of the other members, the collateral under each purchaser's security agreement will be the ownership interest purchased by that member. If the purchase is made by the company, each

14 - Operating Agreement

of the other members must sign a separate security agreement under which the collateral is a percentage of the member's ownership interest after the purchase equal to the percentage ownership interest being purchased by the company. (For example, if there are three members, two of whom have ownership interests of 25 percent and one of whom has an ownership interest of 50 percent, and the company purchases the interest of the 50 percent member, each of 25 percent members, who will have a 50 percent ownership interest after the company's purchase, must provide collateral in the form of a 25 percent ownership interest.) The security agreements also provide that each of the other members has granted the transferring member a security interest in the other member's capital account equal to the percentage of the capital accounts of all members represented by the withdrawing member's capital account.

**9.5.4** The purchase must be closed within 30 days following the determination of the purchase price. At the closing, the dissociating member must sign and deliver to the purchaser or purchasers a written assignment transferring the entire interest of the dissociating member in the company free and clear of all encumbrances. The assignment must contain warranties of title and good right to transfer. At the closing, the purchaser or purchasers must pay the accrued interest on the purchase price then due to the dissociating member and must also sign and deliver the promissory note or notes to the dissociating member. One or more security agreements containing the terms specified in the preceding subsection must be delivered to the purchaser. All security agreements must not only be signed by the debtor but also by all of the members evidencing their consent to transfer of the ownership interest constituting the collateral in the event of a default and their consent to admission of the secured party or a purchaser of the collateral as member of the company following a default.

**9.6** **Effect of Purchase.** A dissociating member will cease to be a member on the dissociation date. After that, the dissociating member will have no rights as a member in the company, except the right to have the member's ownership interest purchased in accordance with the terms of this agreement. If the company and other members fail to purchase a dissociating member's interest and the company is dissolved as a result, the member will be considered to have continued to be a member retroactive to the dissociation date and will have all rights of a member in connection with the winding up of the business of the company.

**9.7** **Successor in Interest**. For purposes of this agreement, the term "dissociating member" includes a dissociating member's successor in interest.

## 10.  **Transfer of Members' Interests**

15 - Operating Agreement

**10.1**    **Effectiveness of Transfers**. No member may transfer any portion of the member's interest in the company except as provided in the section relating to transfer of members' interests. Any purported transfer of an ownership interest in violation of this agreement will be void and of no effect. For purposes of this section a "transfer" includes a sale, exchange, pledge, or other disposition, whether voluntary, involuntary, or by operation of law, and specifically includes the transfer of a member's interest incident to a dissolution of the member's marriage or a legal separation from his or her spouse.

**10.2**    **Securities Law Restriction**. Each member acknowledges that the members' interests in the company have not been registered under the Securities Act of 1933 or applicable state securities laws in reliance on exemptions from registration and that the resale or other transfer of the members' interests is restricted by applicable provisions of the Securities Act of 1933 and applicable state securities laws. Each member agrees that the member's interest may not be offered for sale, sold, transferred, pledged, or otherwise disposed of unless the members' interests in the company are registered under the Securities Act of 1933 and applicable state securities laws or unless an exemption from registration is otherwise available. ***Notwithstanding any other provision of this agreement, the interest of a member in the company may not be offered for sale, sold, transferred, pledged, or otherwise disposed of by a member in the absence of an effective registration statement under the Securities Act of 1933 and applicable state securities laws or an opinion of counsel satisfactory to the managers that registration under the Securities Act of 1933 and applicable state securities laws is not required.***

**10.3**    **Permitted Transfers**. Subject to the section relating to securities law restriction, a member may transfer all or a part of the member's ownership interest for estate planning purposes of the member, or in conjunction with the administration of a trust or estate in the event of death or disability, transfers pursuant to section 2.3.2 of this agreement, or with the prior written consent of all other members. If the a transfer requires consent, and the other members do not consent, the member may transfer the interest if: (a) the interest has been tendered for sale to the company in accordance with the section of this agreement relating to tender of interest; (b) the tender has not been accepted by the company or the other members within the time limits set forth in that section; (c) the transfer is made to the transferee named in the notice of tender within 180 days after the notice of tender is effective; and (d) the transfer is at a price and on terms no more favorable to the transferee than those set forth in the notice of tender.

**10.4**    **Tender of Interest**. If a member wishes to transfer all or part of the member's ownership interest and the other members do not consent, the interest must be tendered for sale by giving notice of a tender to the company. The notice must contain the name and address of the proposed transferee, the price to be paid by the proposed transferee for the interest, if any, and the terms of the proposed transfer. If a member's interest is transferred involuntarily or by operation of law, the successor in interest to the transferring member may give notice of a tender to the company at any time following the transfer. Another member may also give notice of a tender on behalf of a successor in interest to a member whose interest has been transferred involuntarily or by operation of law. In this case, the notice must be given to the successor in interest as well as the

16 - Operating Agreement

company, and the successor in interest will be deemed to have given the notice of a tender at the time it is given by the other member. For purposes of this agreement, the term "tendering member" includes a successor in interest to a member whose ownership interest has been transferred.

**10.5** **Acceptance of Tender.** Within 60 days after a notice of tender is given, the company may accept the tender by giving written notice to the tendering member. The company will then have the right to purchase the tendered ownership interest for the lesser of the price set forth in the notice of tender (if the proposed transfer is to be by sale) or the price determined under this agreement as if the tendering member dissociated from the company and the date of the tender was the dissociation date. The purchase price will be paid on the terms that would apply under this agreement if the tendering member had dissociated, unless the proposed transfer involves a sale, in which case the company may choose whether the pay the purchase price on the terms set forth in the notice of tender or under this agreement.

**10.6** **Purchase by Members.** If the company fails to exercise its right to accept a tender, any member may accept the tender and purchase the tendered interest at the same price and on the same terms that would apply to a purchase by the company. Notice of acceptance of tender by a member must be given to all other members as well as to the tendering member. The tender must be accepted by a member within 15 days following the expiration of the 60-day period for the company to accept the tender. If more than one member accepts the tender, the accepting members have the right to purchase the tendered interest pro rata in accordance with their ownership interests.

**10.7** **Purchase of Entire Interest Required.** No acceptance of a tender will be effective unless the tender is accepted by the company or by one or more of the other members as to the entire ownership interest tendered. A tendering member is not required to sell an ownership interest to the company or other members unless the entire interest being tendered is purchased.

**10.8** **Effect of Tender.** The member tendering an ownership interest will cease to be a member with respect to the interest when the tender is accepted by the company or the other members. Thereafter, the tendering member will have no rights as a member in the company, except the right to have the tendered interest purchased in accordance with the terms of this agreement.

**10.9** **Substitution.** If all or part of a member's ownership interest is transferred, the transferee will be admitted as a member of the company if all of the other members consent to the admission and the transferee executes and delivers to the company a written agreement to be bound by all of the terms and provisions of this agreement. The consent of the other members may be withheld reasonably or unreasonably. If the transferee is the only member of the company following the transfer, the transferee will be admitted as a member without the need for consent or agreement to be bound by the terms of this agreement. If a transferee is not admitted as a member, the transferee will be allocated the portion of the company's profit or loss allocated to the ownership interest that has

**17 - Operating Agreement**

been transferred and will have the right to receive distributions from the company with respect to the interest. But the transferee will not have the other rights of a member, such as the right to vote or to inspect records of the company.

## 11. Dissolution and Winding Up

**11.1 Causes of Dissolution**. The company will dissolve on the earliest of the following events: (a) approval of a dissolution of the company by action of the members; or (b) at such time as the company has no members.

**11.2 Liquidation after Dissolution**. Following the dissolution of the company, the managers must wind up its affairs. A full account must be taken of the assets and liabilities of the company, and assets that will not be distributed to creditors or members in kind must be promptly liquidated. The assets of the company must then be applied and distributed in the following order of priority:

**11.2.1** To the creditors of the company in satisfaction of liabilities and obligations of the company, including, to the extent permitted by law, liabilities and obligations owed to members as creditors (except liabilities for unpaid distributions);

**11.2.2** To any reserves set up for contingent or unliquidated liabilities or obligations of the company deemed reasonably necessary by the managers, which reserves may be delivered to an escrow agent to be held for disbursement in satisfaction of the liabilities and obligations of the company, with any excess being distributed to the members as provided in the following subsection; and

**11.2.3** To the members in proportion to the positive balances of their capital accounts, after taking into account all adjustments made to capital accounts for the fiscal year during which the distributions to members are made.

**11.3 Distribution of Property in Kind**. Property of the company may be distributed to members in kind in the process of winding up with the unanimous approval of the members. As provided in Treasury Regulations §1.704-1(b)(2)(iv)(e)(1), any property distributed in kind must be valued and treated for the company's accounting purposes as though the property had been sold at fair market value on the date of distribution, The difference between the fair market value of the property and its adjusted tax basis will be treated as a gain or loss on the sale of the property and will be credited or charged to the members' capital accounts in the manner specified in the section of this agreement relating to capital accounts. This gain or loss will not be treated as gain or loss recognized by the company for income tax purposes.

**11.4 Negative Capital Accounts**. If there is a negative balance in any member's capital account after the business of the company is wound up, the member will have no obligation to make any contribution to the capital of the company to make up the deficit, and the deficit will not be considered a debt owed to the company or any other person for any purpose.

**18 - Operating Agreement**

**12.** **Representations and Warranties of Members**

Each member represents and warrants to the company and the other members that such member has acquired an interest in the company for such member's own account for investment and not with a view to distribution of the interest.

**13.** **Miscellaneous Provisions**

**13.1** **Amendment**. All or part of this agreement may be amended or repealed by action of the members. The agreement may not be amended or repealed by oral agreement of the members or by oral or written agreement of the managers.

**13.2** **Binding Effect**. The provisions of this agreement are binding on and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the members. This section is, however, not a modification of any restriction on transfer set forth in this agreement.

**13.3** **Notice**. Except as otherwise provided in other sections of this agreement, any notice or other communication required or permitted to be given under this agreement must be in writing and must be mailed by certified mail, return receipt requested, with postage prepaid. Notices addressed to a member must be addressed to the member's address listed in the section of this agreement relating to initial members, or if there is no such address listed for a member, the address of the member shown on the records of the company. Notices addressed to a manager of the company must be addressed to the principal office of the company. The address of a member or manager to which notices or other communications are to be mailed may be changed from time to time by the member's or manager's giving written notice to the other members, the other managers and the company. The address of the company to which notices or other communications are to be mailed may be changed from time to time by the company's giving written notice to the members and managers. All notices and other communications will be deemed to be given at the expiration of three days after the date of mailing.

**13.4** **Litigation Expense**. If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in the proceeding will be entitled to recover a reasonable attorneys' fee in the proceeding, or any appeal, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

**13.5** **Additional Documents**. Each member must execute all additional documents and take all actions as are reasonably requested by the managers in order to complete or confirm the transactions contemplated by this agreement.

**13.6** **Counterparts**. This agreement may be executed in two or more counterparts, which together will constitute one agreement.

**19 - Operating Agreement**

**13.7** **Governing Law**. This agreement will be governed by the law of the state in which the articles of organization of the company have been filed and must be construed in accordance with the law of that state.

**13,8** **Venue.** Any action or proceeding seeking to enforce any provision of this Agreement or based on any right arising out of this Agreement must be brought against any of the parties in Deschutes County Circuit Court of the State of Oregon or, subject to applicable jurisdictional requirements, in the United States District Court for the District of Oregon, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to such venue.

**13.9.** **Exhibits.** The exhibits referenced in this Agreement are part of this Agreement as if fully set forth in this Agreement.

**13.10** **Severability**. If any provision of this agreement is invalid or unenforceable, this will not affect the remaining provisions.

**13.11** **Third Party Beneficiaries**. The provisions of this agreement are intended solely for the benefit of the members and managers and create no rights or obligations enforceable by any third party, including any creditor of the company, except as otherwise provided by applicable law.

**13.12** **Injunctive and Other Equitable Relief.** The parties agree that the remedy at law for any breach or threatened breach by a party may, by its nature, be inadequate, and that in addition to damages, the other parties will be entitled to a restraining order, temporary and permanent injunctive relief, specific performance, and other appropriate equitable relief, without showing or proving that any monetary damage has been sustained.

**13.13** **Authority**. Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement will constitute the legally binding obligation of the corporation or other entity that the individual represents.

**13.14** **Counsel**. This agreement has been drafted by David W. Smiley (the "attorney"), who represents the Farmington Industries LLC in connection with the creation of this operating agreement. Chris Spoto, Chris Spoto, Trustee of the Chris Spoto Revocable Trust, and Chris Spoto as Trustee of the Farmington Industries Trust each understand that the attorney can represent only one party in connection with this matter and that the attorney represents Farmington Industries, LLC and does not represent them. Chris Spoto, Chris Spoto, Trustee of the Chris Spoto Revocable Trust, and Chris Spoto as Trustee of the Farmington Industries Trust, acknowledge that they have been advised by the attorney that they should retain attorneys of their own choice in connection with this matter.

20 - Operating Agreement

CHRIS SPOTO REVOCABLE TRUST

By: _____
      Name: CHRIS SPOTO
      Title:  Trustee

FARMINGTON INDUSTRIES TRUST

By: _____
      Name: CHRIS SPOTO
      Title:  Trustee

**21 - Operating Agreement**

# EXHIBIT A

Assets that are to be contributed to the capital of the company by the members:

| Member | Capital Contribution |
|---|---|
| Chris Spoto Revocable Trust, by and through Chris Spoto | Intangible Property Rights associated with information provided to the company the formation of design, implementation, marketing and business plan received and utilized by the company to support of the specialty crop agricultural programs and/or business undertaken by Farmington Industries, LLC pursuant to its company purpose set forth in paragraph 1.6 of the Operating Agreement; all such intellectual property rights being provided according to commercially reasonable standards.<br><br>Funds contributed in the amount of $_____. |
| Farmington Industries Trust, by and through its trustee, Chris Spoto | Intangible Property Rights associated with information provided to the company the formation of design, implementation, marketing and business plan received and utilized by the company to support of the specialty crop agricultural programs and/or business undertaken by Farmington Industries, LLC pursuant to its company purpose set forth in paragraph 1.6 of the Operating Agreement; all such intellectual property rights being provided according to commercially reasonable standards. |

**Exhibit A**

| | |
|---|---|
| **From:** | "David W. Smiley" <david@dwsmiley.com> |
| **To:** | "chris s." <chris.spoto@gmail.com> |
| **CC:** | "Jeff Callahan" <callajd@gmail.com> |
| **Date:** | 4/29/2016 3:36:48 PM |
| **Subject:** | Documents for Your Review and Consideration |
| **Attachments:** | LLC.02.160429.Farmington LLC - Operating Agreement.APF26.ForExecution.doc |
| | LLC.03.160429.Membership Tender Agreement.APF53.doc |
| | LLC.04.160429.Agrmnt Adding New Member.APF55.doc |
| | Cover Sheet to Business Plan For Consideration.doc |

Gentlemen:

After making the changes Jeff and I discussed, please find the attached documents for your consideration and review.

I will provide you a copy of the trust either tonight or tomorrow. The trust will have both of you as the Settlors (the persons who set up the trust) and Chris as trustee with Jeff as a successor trustee.

I have a very simple single member llc operating agreement for a bookkeeping company if you want it.

*David W. Smiley*

Attorney at Law
DAVID W. SMILEY, P.C.
168 NW Greenwood Avenue, Bend, Oregon 97703
Office:      (541) 318-1288
Facsimile:    (541) 318-1289

E-mail:      david@dwsmiley.com

**CONFIDENTIALITY NOTICE:** This e-mail may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system. Use, dissemination, distribution, or reproduction of this transmission by unintended recipients is not authorized and may be unlawful.

**CIRCULAR 230 NOTICE:** To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this e-mail, including attachments to this e-mail, is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.

**WARNING:** Computer viruses can be transmitted via email. The recipient should check this email and any attachments for the presence of viruses. David W. Smiley, P.C., accepts no liability for any damage caused by any virus transmitted by this email.



# MEMEBERSHIP TENDER AGREEMENT

**DATE:** _____

**PARTIES:** The Farmington Industries Trust, by and through its trustee, Chris Spoto (the "tendering member")

    Farmington Industries, LLC, a limited liability company created under the laws of state of Oregon (the "company")

## RECITALS:

**A.** The tendering member is a member of the company. The company operates under an Operating Agreement dated April 28, 2016 (the "operating agreement"). The tendering member is granted a specific right under section 2.3.2 of the operating agreement to tender interests back to the company from time to time requiring only the approval of the managers.

**B.** The tendering member is the owner of a[n] _____20%_____ percent interest in the profits and losses of the company and of a capital account representing _____100%_____ percent of the capital of the company.

**C.** Pursuant to section 2.3.2 of the operating agreement, the managers of the company may receive the tendered interest for no consideration, and simultaneously utilize the membership interest contributed by the tendering member for issuing to a new or existing member to obtain additional capital contributions, with no consideration being received or enjoyed by the tendering member for the membership interests so tendered.

**D.** The tendering member is not withdrawing from the company, and, in accordance with the terms of the operating agreement, the other members have elected to continue the company and cause the company to receive the interest of the tendering member.

## AGREEMENTS:

**1.** **Assignment and Acceptance**

The tendering member assigns and transfers to the company a_____ percent (___%) membership interest in the company, representing _____ (___%) of the tendering member's interest in the company, including all rights in the profits, losses, and distributions of the company and all rights of the capital of the company associated with the membership interest tendered to the company by the tendering member. The company accepts the assignment and transfer as specified.

**1 - Membership Tender Agreement**

**2.** **No Payment Received for Tender.**

    **2.1** **No Remuneration.** The tendering member shall not receive any money or benefit for the interest tendered to the company.

    **2.2** **Tax Treatment**. The tendering member interest shall be tender in a manner that has no tax effect on either the tender or the receipt of the interest tendered to either the tendering members or the company.

**3.** **Payment of Indebtedness**

All indebtedness due from the tendering member to the company and from the company to the tendering member (except for obligations arising out of this agreement) must paid in full at the time this agreement is signed.

**4.** **Representations and Warranties**

    **4.1** **Authority and Binding Effect**. The tendering member represents and warrants to the company and the other members that the tendering member has full power and authority to execute and deliver this agreement and to make the transfer provided in this agreement.

    **4.2** **Ownership of Interest and Right to Transfer**. The tendering member represents and warrants to the company and the other members that the tendering member is the sole owner of the interest in the company being transferred under this agreement, free and clear of any and all liens or encumbrances. The tendering member has a good right to transfer the interest to the company.

    **4.3** **Accounting.** The tendering member represents and warrants, that the tendering member has rendered to the company a full accounting of all things relating to the company for the period up to and including the date of this agreement.

**5.** **Continuation of Company**

The business of the company and the operating agreement will remain in full force and effect following the tender and the tender is not otherwise unlawful or prohibited. Following the tender of the tendering member's interest to the company, and the simultaneous issuance to a new member of the company, the ownership interests of the other members will be as follows:

[*The remainder of this page is intentionally left blank*]

**2 - Membership Tender Agreement**

| Name | Contribution | Membership Interest |
|------|--------------|---------------------|
| Chris Spoto Revocable Trust, by and through its trustee, Chris Spoto 195 SE 3rd Street, Bend, Oregon 97702 | As reflected in the company books and records. | 80.0% |
| Farmington Industries Trust, by and through its trustee, Chris Spoto 195 SE 3rd Street, Bend, Oregon 97702 | See **Exhibit** A attached here to and made a part hereof. | 20.0% |
| [*Set forth Name of New Member*] | [*Set for $ amount of capital contribution of new member*] | [*Insert % of Membership Interest*] |
| | | |
| | | |
| | | |
| | | |
| | | |

[*Each time a new member is added the listing should include all prior members*]

## 6. Miscellaneous Provisions

**6.1    Binding Effect.** The provisions of this agreement are binding upon and will inure to the benefit of the heirs, personal representatives, successors, and assigns of the parties.

**6.2    Notice.** Any notice, consent, or other communication required or permitted to be given or made under this agreement must be in writing and will be deemed to have been sufficiently given or made either (a) immediately when sent by facsimile machine to the facsimile number noted below, or (b) upon delivery when personally delivered or mailed by certified mail, return receipt requested, to the address and attention noted below:

Tendering member:                 195 SE 3rd Street, Bend, Oregon 97702

Company:                          195 SE 3rd Street, Bend, Oregon 97702

Any party may change its facsimile number or address for notices by giving notice of such change to the other parties in accordance with this section.

**6.3    Litigation Expense**. If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in

**3 - Membership Tender Agreement**

the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover a reasonable attorneys' fee in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

6.4    **Governing Law**. The validity and interpretation of this agreement will be governed by the law of the state of Oregon.

6.5    **Entire Agreement.** This agreement constitutes the entire agreement between the parties pertaining to its subject matter, and it supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this agreement will be binding unless executed in writing by all parties.

6.7    **Authority**. Each individual executing this agreement on behalf of a corporation or other entity warrants that he or she is authorized to do so and that this agreement constitutes the legally binding obligation of the corporation or other entity that the individual represents.

Executed as of the first date written above.

**TENDERING MEMBER:**                    **COMPANY:**

FARMINGTON INDUSTRIES TRUST          FARMINGTON INDUSTRIES, LLC

By: _____          By: _____
        Chris Spoto, Trustee                    Name:  Chris Spoto
                                               Its:      Manager

**4 - Membership Tender Agreement**

# AGREEMENT ADDING NEW MEMBER

**DATE:** _____[*Add Date*]

**PARTIES:** _____**[***Add Name*] (the "new member")

Farmington Industries, LLC, a limited liability company created under the laws of the state of Oregon (the "company")

## RECITALS:

A.     The new member wishes to acquire an interest as a member of the company.

B.     The company operates under an Operating Agreement dated April 28, 2016 (the "operating agreement"), which provides that new members of the company may be admitted with the consent of the managers.

## AGREEMENTS:

**1.     Contribution and Members' Interests**

    **1.1**     **New Member's Contribution and Interest**. The new member agrees to contribute the sum of _____ ($_____) [*add amount*] to the capital of the company in exchange for an interest as a member of the company. The new member's contribution must be made in cash immediately after all parties sign this agreement. By making the contribution, the new member will receive an interest in the capital of the company equal to the amount of the contribution and will be entitled to _____ (____%) percent [*add amount*] of the profits and interim distributions of the company. The new member's interest in the company will also be chargeable with that same percent of the losses of the company.

    **1.2**     **Existing Members' Interests**. The new member agrees that current combined value of the existing members' interests in the company is $_____ **[***This amount should be equal to the value of the capital contribution of the company multiplied by the percentage interest the new member is receiving*]. This value is not equal to the current aggregate total of the existing members' capital accounts that are shown on the company's books and records. In order to insure that the interests of the all members in the capital of the company is based on the value of their contributions at the date of this agreement, the existing members' capital accounts will be adjusted to reflect the current fair market value of their interest, effective on the date of this agreement. For all purposes under the operating agreement, the existing members will, following the date of this agreement, be deemed to have made contributions to the capital company in an amount equal to the current agreed fair market value of their interests.

**1 - Agreement Adding New Member**

**1.3** **Effective Date**. The new member will be admitted as a member of the company effective on this date of this agreement. Unless the date of this agreement is the first day of fiscal year of the company, the income or loss of the company for the tax year in which the new member is admitted must be allocated between the new member and the existing members. This allocation may be made in any manner permitted under IRC §706(d)(1) as may be selected by action of the members of the company taken in accordance with the operating agreement.

**2.** **Operating Agreement**

**2.1** **Amendments to Operating Agreement**. Effective on the date of this agreement, the operating agreement is amended as follows:

**2.1.1** The operating agreement is amended by adding the new member to the list of members in the parties section.

**2.1.2** The operating agreement is amended by amending section 2.1 as follows:

By adding a new member as follows:

| Name and Address | Contribution | Membership Interest__ |
|---|---|---|
| _____f_____ [*New Member Name*] _____ _____ [*New Member Address*] | $_____ [Set forth the amount as reflected in the company books and records, now adjusted to reflect the capital contribution of the new member] | ___.0% |

together with a reciprocal reduction in the ownership percentage of the Farmington Industries Trust, which is holding the shares that will be tendered to the company to be provided to the new member

**2.1.3** The operating agreement is amended by deleting section 2.2 and substituting the following:

**2.2** **Initial Capital Contributions**. The initial capital contribution of _____ [*new member*] has been made to the company in accordance with the terms of an Agreement Adding New Member dated _____ [*use date of this agreement*], and the agreed value of the contribution set forth in the preceding subsection is the agreed value set forth in that agreement. The agreement adding new member provides that existing members are deemed to have made capital contributions to the company in the amounts set forth in the preceding subsection, and those amounts include, and are not in addition to, any capital contributions made by the

**2 - Agreement Adding New Member**

existing members  prior to the date of the agreement adding new member. The deemed contributions made by the existing members take the form of interests in the property of the company existing at the date of the agreement adding new member. In accordance with IRC §704(c) and the corresponding regulations, income, gain, loss, and deduction with respect to property of the company existing on the date of the agreement adding new member must be allocated among the members, solely for income tax purposes, so as to take into account any variation between the adjusted basis of the property for federal income tax purposes in the hands of the company and the agreed value of the interests of  existing as set forth in the agreement adding new member.

**2.2** **Assumption of Obligations**. The new member agrees to be bound by all of the terms and provisions of the operating agreement, as amended under the terms of this agreement.

## 3. Consent

The existing members of the company have consented to the admission of the new member as a member of the company pursuant to the powers vested to the managers of the company and have agreed that the new member will have all the rights and obligations of a member of the company. The existing members also approve and agree to the amendments to the operating agreement made under the terms of this agreement.

## 4. Representations and Warranties

The company represents and warrants to the new member that:

**4.1** **Status**. The company is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Oregon and has all powers required to own its assets and property and to carry on its business as now owned and conducted. The company is not licensed or qualified as a foreign limited liability company in any other state, and such license and qualification are unnecessary given the character of its properties and the nature of its business.

**4.2** **Operating Agreement**. The operating agreement is in full force and effect in accordance with its terms and has not been amended or modified in any manner, except as provided in this agreement.

**4.3** **Assets**. The company has good and marketable title to all of its assets, including all property reflected in the company's financial statements, free and clear of all claims and encumbrances, except any liens for taxes not yet due and payable. The company either owns or leases from persons other than members of the company all of the assets related to or used in the conduct of its business, and those assets are adequate for the conduct of such business.

**3 - Agreement Adding New Member**

**4.4    Compliance with Law**. The company is not in violation of any applicable law, ordinance, regulation, order, or requirement relating to its operations.

**4.5    Actions and Suits**. There are no actions, suits, or proceedings pending or threatened against or affecting the company at law or in equity or before or by any federal, state, municipal, or other governmental or nongovernmental department, commission, board, bureau, agency, or instrumentality that can reasonably be expected to result in any adverse change in the business, properties, operations, prospects, or assets of the company or in its condition, financial or otherwise.

**4.6    Obligations and Contracts**. The company is not in default in the payment of any of its obligations and is not in breach of the performance of any contract to which it is a party.

**4.7    Complete Disclosures**. Neither this agreement nor any document furnished to the new member by the company under this agreement contains any untrue statement of a material fact or omits to state a material fact necessary in order to make any statement in this agreement or in such documents or instruments not misleading.

## 5.    Securities Laws

**5.1    Investment Intent.** The new member represents and warrants to the company and the existing members that the new member is acquiring an interest as a member of the company for investment and not with a view to distribution.

**5.2    Securities Law Registration.** The new member understands that the members' interests in the company have not been registered under the Securities Act of 1933 or applicable state securities laws in reliance upon exemptions from registration. The new member also understands that the interest being acquired must be held indefinitely, unless it is later registered under the Securities Act of 1933 and applicable state securities laws, or unless exemptions from registration are otherwise available, and that the company has no obligation to register the interest. The new member agrees that the interest will not be offered, sold, transferred, pledged, or otherwise disposed of without registration under the Securities Act of 1933 and applicable state securities laws or an opinion of counsel acceptable to the company that such registration is not required.

## 6.    Miscellaneous Provisions

**6.1    Litigation Expense**. If any legal proceeding is commenced for the purpose of interpreting or enforcing any provision of this agreement, including any proceeding in the United States Bankruptcy Court, the prevailing party in such proceeding will be entitled to recover reasonable attorneys' fees in such proceeding, or any appeal thereof, to be set by the court without the necessity of hearing testimony or receiving evidence, in addition to the costs and disbursements allowed by law.

**6.2    Governing Law**. The validity and interpretation of his agreement will be governed by the law of the state of Oregon.

**4 - Agreement Adding New Member**

6.3 **Entire Agreement.** This agreement constitutes the entire agreement between the parties pertaining to its subject matter, and it supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this agreement will be binding unless executed in writing by all parties.

6.4 **Authority**. Each individual executing this agreement on behalf of a limited liability company warrants that he or she is authorized to do so and that this agreement will constitute the legally binding obligation of the limited liability company that the individual represents.

6.5 **Counterparts.** This Agreement may be executed in counterparts, each of which will be considered an original and all of which together will constitute one and the same agreement.

6.6 **Facsimile and Electronic Signatures.** Facsimile transmission or electronic transmission of any signed original document, and retransmission of any signed facsimile transmission or electronic transmission, will be the same as delivery of an original. At the request of any party, the parties will confirm facsimile transmitted signatures and electronically transmitted signatures by signing an original document.

6.7 **Further Assurances.** Each party agrees to execute and deliver such other documents and to do and perform such other acts and things as any other party may reasonably request to carry out the intent and accomplish the purposes of this Agreement.

Executed as of the first date written above.

**NEW MEMBER:**                                    **COMPANY:**

                                                   FARMINGTON INDUSTRIES, LLC

By: _____                      By: _____
                                                   Name:  Chris Spoto
**Name:_____**                     Its:      Manager

**5 - Agreement Adding New Member**

| **From:** | "chris s." <chris.spoto@gmail.com> |
| **To:** | kevin@caringbrandsint.com |
| **CC:** | callajd@gmail.com |
| **Date:** | 11/27/2016 1:04:08 PM |
| **Subject:** | Farmington Industries First Year Budget Analysis |
| **Attachments:** | BudgetProjectionsYearOne.xlsx |

Hi Kevin,

Farmington has reached a point in its development where we must decide on how aggressively to move forward in the development of our core business.  Here we consider three options for moving forward, distinguished chiefly by the scale of the initial buildout and the rate of growth that initial buildout can drive.

Keep in mind these numbers and timelines are estimates and therefore subject to change.  However, we've done our best to ground these numbers with real bids and professional estimates when possible.  The snapshot below outlines the three primary options for moving forward; there are other options including a total buildout and/or outright purchase of the building.  We can provide the data for those scenarios on request.

|  | One Flower Room | Two Flower Rooms | Four Flower Rooms |
|---|---|---|---|
| Initial Build Cost | $109,000 | $195,000 | $475,000 |
| Monthly Burn | 4 at $18,000/month | 4 at $23,250/month | 4 at $39,350/month |
| Total Burn To Profit | $72,000 | $93,000 | $157,400 |
| Peak Debt Burden (March) | $163,000 | $264,750 | $593,050 |
| Profitability Date | April | May | May |
| Facility Completion | December | August | June |
| End of Year Cash | $395,950 | $1,198,700 | $2,334,900 |

We believe the middle column is our strongest option.  A marginal increased debt burden of approximately $100,000 introduces no delay to reach profitability while increasing the net end of year cash by approximately $800,000 and advancing facility completion from December to August.  Further, no additional labor would be required to manage this increase in capacity.

On the other hand, jumping from the middle column to far right column, while justified by the profit, might not be justified by the increased debt burden of more than $300,000 in addition to the increased labor immediately required to manage this production capacity.  This choice would also only advance facility completion from August to June without advancing the date at which we cross into profitability.

To be clear, we are prepared to move forward with any of these scenarios but we believe the scenario described in the middle column best balances the overall risk with the demands on the company, the debt burden, and the pace of scaling up.  If we find that we are prepared to accelerate the final buildout during execution, we can always address that when the time comes.

Thanks for reviewing this information, please let us know any questions you may have.

Chris & Jeff

Co-founders

Farmington Industries

# LEASE TERMINATION AGREEMENT

This Lease Termination Agreement ("Agreement") is entered into by and among L & D OF OREGON, INC., an Oregon corporation (the "Landlord"), FARMINGTON INDUSTRIES, LLC (the "Tenant"), and CHRIS SPOTO (the ("Guarantor") (collectively the "Parties").

**Whereas**, the Parties have entered into that commercial lease agreement, commencing June 1, 2015, pertaining to those certain leased premises described therein (the "Premises"). A copy of the commercial lease is attached hereto as Exhibit A hereto and made a part hereof by this reference; and

**Whereas**, the Tenant has declared it is in a condition of insolvency to the Landlord, has indicated that the Guarantor has made the last two monthly lease payments as a result of said insolvency, and has stated to the Landlord that it is not in a financial condition to be able to make the lease payment now due and owing; and

**Whereas**, the Landlord has located a replacement occupant to lease the Premises on terms and conditions acceptable to the Landlord;

**Whereas**, the Parties now desire to provide for the termination of the Lease, and the return of the Leased Premises to Landlord, prior to the current expiration date of the Lease.

**NOW, THEREFORE**, in consideration of mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follow:

**1. Termination.** The Parties agree that in lieu of the original expiration date of May 31, 2020, the Lease shall terminate on February 1, 2017 ("Termination Date"). Prior to the Termination Date, Tenant shall quit the Premises, remove a personal property, and surrender and return the Premises to Landlord, "as is" in broom clean condition.

**2. Lease Termination Fee.** In consideration for Tenant and Guarantor being relieved of further obligations under the Lease after the Termination Date, Tenant, Guarantor and Landlord agree that Guarantor shall pay a Lease Termination Fee equal to the cost of Landlord's attorney fees for drafting a new lease for a replacement occupant for the Premises. This payment shall be made to Landlord in conjunction with the termination of this lease, and retained from the $15,000 deposit to be returned to the Guarantor.

**3. Mutual Release.** Upon Tenant satisfying its obligations set forth in this Agreement, Landlord releases, discharges and waives any claims known or unknown, against Tenant, its successor, assigns, officers or directors, arising out of or in any way connected with the Lease through the date hereof, and Tenant releases, discharges and waives any claims, known or unknown, against the Landlord, its successors, assigns, officers or directors, arising out of or in anyway connected with the Lease through the date hereof.

**4. Binding upon Successors and Assigns.** This Agreement shall be for the benefit of and be binding upon, the Parties hereto and their respective successors and assigns.

**5. Final Agreement.** This Agreement shall constitute the final agreement and understanding of the Parties on the subject matter hereof. This Agreement may be modified only by a further writing signed by the Parties.

LEASE TERMINATION AGREEMENT

6. **Attorney Fees.** If any legal action is commenced to enforce or interpret the terms of this Lease Termination Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs in addition to any other relief to which the prevailing party may be entitled.

7. **Oregon Law; Illegality.** This Agreement shall be governed by the laws of the State of Oregon. In case any one or more of the provisions contained herein shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provisions had not been contained herein.

8. **Counterparts.** This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. Federal ESIGN Act of 2000) or other transmission.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by their duly authorized officers effective the first day of February, 2017.

**LANDLORD:**                                   **TENANT:**

L & D OF OREGON, INC.                    FARMINGTON INDUSTRIES, LLC

By: _____                     By: _____

Title: _Presid_t_                              Title: _MANAGER_

**GUARANTOR:**

_____

CHRIS SPOTO

---

# COMMERCIAL LEASE

Dated:      Effective February 1, 2017

Between:    **L & D OF OREGON, INC.,** an Oregon corporation    ("Landlord")
          235 SE 3rd Street
          Bend, Oregon 97708

And:        **STORM 3 LLC,** an Oregon limited liability company    ("Tenant")
          1735 SW Chandler Avenue, Suite 1
          Bend, Oregon 97702

And:        **VALERIE KAHMANN**        ("Guarantor")

Landlord leases to Tenant and Tenant leases from Landlord the following described property commonly known as 63075 Plateau Court, Bend, Oregon (the "Premises") on the terms and conditions stated below:

Lot 39, NORTH BRINSON BUSINESS PARK II, Deschutes County, Oregon.

## 1.    OCCUPANCY.

1.1    ORIGINAL TERM.  The term of this lease shall commence on February 1, 2017, and continue for 40 months thereafter.

1.2    POSSESSION.  Tenant's right to possession and obligations under the lease shall commence on the date that the City of Bend issues an Occupancy Permit allowing Tenant to occupy the Premises.

1.3    RENEWAL OPTION.  If Tenant is not and has not been in default hereof, Tenant shall have the option to renew this lease for one successive term of 60 months, as follows:

(a)    The renewal term shall commence on the day following the date of termination of the preceding term.

Page 1 – Commercial
Lease
                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

(b)     The option may be exercised by written notice to Landlord given not less than 120 days prior to the last day of the expiring term. The giving of such notice shall be sufficient to make the lease binding for the renewal term without further act of the parties who shall then be bound to take the steps required in connection with the determination of rent as specified below.

(c)     The terms and conditions of the lease for the renewal term shall be identical with the original term except for rent. Rent for a renewal term shall be the amount of rent as agreed to by the parties, but in no event shall the basic rent for the renewal term be less than the basic rent as set forth in Paragraph

2.     **RENT.**

2.1     BASIC RENT. Tenant shall pay to Landlord as rent the following:

(a)     For the first 20 months, the sum of $5,665.00 per month; and

(b)     For the next 20 months, the sum of $6,000.00 per month.

Rent shall be payable on the first day of each month, in advance, at such place as may be designated by Landlord, except that rent for the first month has been paid upon the execution of this lease, and Landlord acknowledges receipt of same.

2.2     SECURITY DEPOSIT. To secure Tenant's compliance with all terms of this lease, Tenant has paid Landlord the sum of $15,000.00 as a deposit. The deposit shall be a debt from Landlord to Tenant, refundable within 30 days after expiration of the lease term or other termination not caused by Tenant's default. Landlord may commingle the deposit with its funds and Tenant shall not be entitled to interest on the deposit. Landlord shall have the right to offset against the deposit any sums owing from Tenant to Landlord and not paid when due, any damages caused by Tenant's default, the cost of

Page 2 – Commercial Lease

C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 64 of 91

Case 17-31502-tmb7     Doc 27     Filed 08/11/17

curing any default by Tenant should Landlord elect to do so, and the cost of performing any repair or cleanup that is Tenant's responsibility under this lease. Offset against the deposit shall not be an exclusive remedy in any of the above cases, but may be invoked by Landlord, at its option, in addition to any other remedy provided by law or this lease for Tenant's nonperformance. Landlord shall give notice to Tenant each time an offset is claimed against the deposit and, unless the lease is terminated, Tenant shall within 10 days after such notice deposit with Landlord a sum equal to the amount of the offset so that the total deposit amount, net of offset, shall remain constant throughout the lease term. If, on the first day of the 60th month, the Tenant is not and has not been in default, then from the Security Deposit, $5,665.00 shall be paid to Landlord for the last month's rent.

2.3 ADDITIONAL RENT.

(a) TAXES, INSURANCE COSTS AND UTILITY CHARGES. Tenant is required to pay by this lease, and any other sum which Tenant is required to pay to Landlord or third parties shall be additional rent.

(b) TENANT IMPROVEMENTS. Tenant, at Tenant's cost, shall finish the office, bathrooms, general lighting, electrical plugs and water taps as agreed upon by the Landlord and Tenant in conformance with the drawings that they have shared.

3. USE OF THE PREMISES.

3.1 PERMITTED USE. The premises shall be used for the cultivation of marijuana and for no other purpose, without the consent of Landlord, which consent shall not be withheld unreasonably. Tenant shall indemnify, defend and hold Landlord harmless from any and all claims or expenses, that are made due

Page 3 – Commercial
Lease                          C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

to Tenant's use of the Premises, and whether from any person or entity, public or private, to include any city, county, state or federal government.

3.2    RESTRICTIONS ON USE.  In connection with use of the premises Tenant shall:

(a)    Conform to all applicable laws and regulations of any public authority affecting the premises and the use of the premises and correct at Tenant's own expense any failure of compliance created through Tenant's fault or by reason of Tenant's use.  Tenant shall not be required to make any structural changes to effect such compliance, unless such changes are required because of Tenant's specific use.

(b)    Refrain from any activity which would make it impossible to insure the premises against casualty, would increase the insurance rate, or would prevent Landlord from taking advantage of any ruling of the Oregon Insurance Rating Bureau or its successor allowing Landlord to obtain reduced premium rates for long-term fire insurance policies, unless Tenant pays the additional costs of the insurance.

(c)    Refrain from any use which would be reasonably offensive to other tenants or owners or users of neighboring premises or which would tend to create a nuisance or damage the reputation of the premises.

(d)    Refrain from loading the floors beyond the point considered safe by a competent engineer or architect selected by Landlord.

Page 4 – Commercial
Lease          C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

(e)     Refrain from making any marks on or attaching any sign, insignia, antenna, aerial, or other devise to the exterior or interior walls, windows or roof of the premises without the written consent of Landlord.

3.3     CONTINUITY OF USE.  Tenant shall use the premises continuously during normal business hours except to the extent the use is interrupted or prevented by causes beyond Tenant's control.  Tenant may work evenings and weekends.

4.     **UTILITIES.**  All utilities, including lights and heat, will be supplied and paid for by Tenant.  In the event, however, that utilities are not metered separately for said premises, Tenant shall, on a monthly basis, reimburse Landlord for the cost of all utilities attributable to Tenant's premises.

5.     **PREMISES AREA.**  Tenant, at Tenant's sole cost and expense, shall maintain the areas surrounding the building located on the Premises as set forth herein and, in addition, shall keep the interior of the Premises in a clean and sanitary condition.

6.     **REPAIRS AND MAINTENANCE.**

6.1     LANDLORD'S OBLIGATIONS.    The following shall be the responsibility of Landlord:

(a)     Repairs and maintenance of the roof and gutters, exterior walls (including painting), bearing walls, structural members, and foundation.

(b)     Repair and maintenance of driveways, curbs and parking areas.

(c)     Repair and maintenance of exterior water, sewage, gas and electrical services to the leased premises.

(d)     Repair of the heating and air conditioning system other than ordinary maintenance.

(e)     Any and all costs for maintaining compliance with existing building codes or other applicable Oregon statutes, including the Americans With Disabilities Act, to the extent that it is required by Oregon law.

6.2     TENANT'S OBLIGATIONS.  The following shall be the responsibility of Tenant:

(a)     Repair of interior walls, floors, including carpets, ceilings, doors and windows and related hardware, light fixtures, switches and exterior plumbing from the point of entry to the premises.

(b)     Any repairs necessitated by the negligence of Tenant, its agents, employees, and invitees, except as provided in paragraph 7.2 dealing with waiver of subrogation.

(c)     Ordinary maintenance of the heating and air conditioning system and any repairs necessary because of improper maintenance.

(d)     Any repairs or alterations required under Tenant's obligation to comply with laws and regulations as set forth in 3.2 (a) above.

(e)     All other repairs to the premises which Landlord is not required to make under 6.1 above.

6.3     LANDLORD'S INTERFERENCE WITH TENANT.  Any repairs, replacements, alterations, or other work performed on or around the premises by Landlord shall be done in such a way as to interfere as little as reasonably possible with use of the premises by Tenant.  Tenant shall have no right to an abatement

Page 6 – Commercial
Lease                           C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

of rent nor any claim against Landlord for any inconvenience or disturbance with the requirement of this provision.

6.4 REIMBURSEMENT FOR REPAIRS ASSUMED. If either party fails or refuses to make repairs which are required of it, the other party may make the repairs and charge the actual costs of repairs to the first party. Such expenditures by Landlord shall be reimbursed by Tenant on demand together with interest at the rate of 10 percent per annum from the date of expenditure by Landlord. Such expenditures by Tenant must be collected directly from Landlord and shall not be withheld from rent. Except in an emergency creating an immediate risk of personal injury or property damage, neither party may perform repairs which are the obligation of the other party and charge the other party for the resulting expense unless at least 30 days before work is commenced the defaulting party is given notice in writing outlining with reasonable particularity the repairs required, and such party fails within that time to initiate such repairs in good faith.

6.5 INSPECTION OF PREMISES. Landlord shall have the right to inspect the premises at any reasonable time or times to determine the necessity of repair. Whether or not such inspection is made, the duty of landlord to make repairs shall not mature until a reasonable time after Landlord has received from Tenant notice in writing of the repairs that are required.

7. ALTERATIONS.

7.1 ALTERATIONS PROHIBITED. Except as provided for herein, Tenant shall make no improvements or alterations on the leased premises of any kind without first obtaining Landlord's written consent.

Page 7 – Commercial Lease
C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 69 of 91

Case 17-31502-tmb7     Doc 27     Filed 08/11/17

7.2     OWNERSHIP OF ALTERATIONS.  All improvements and alterations performed on the leased premises by either Landlord or Tenant shall be the property of Landlord when installed unless the applicable Landlord's consent specifically provides otherwise.

8.      **INSURANCE.**

8.1     INSURANCE REQUIRED.  Landlord shall keep the leased premises insured against fire and other risks covered by a standard fire insurance policy with an endorsement for extended coverage.  Tenant shall, on a monthly basis, reimburse Landlord for insurance attributable to Tenant's premises and Tenant shall bear the expense of any insurance insuring the property of Tenant on the premises against fire and other risks, but Tenant shall not be required to insure its own property.

8.2     WAIVER OF SUBROGATION.  Neither party shall be liable to the other (or to the other's successors or assigns) for any loss or damage caused by fire or any of the risks enumerated in a standard fire insurance policy with an extended coverage endorsement, and in the event of an insured loss neither party's insurance company shall have a subrogated claim against the other.

9.      **TAXES.**

9.1     PROPERTY TAXES.  Tenant shall pay as due all taxes on its personal property located on the leased premises.  Landlord shall pay as due all general real property taxes and special assessments levied against the leased premises and Tenant shall reimburse Landlord on a monthly basis for all real

Page 8 – Commercial
Lease                                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 70 of 91
Case 17-31502-tmb7     Doc 27     Filed 08/11/17

property taxes paid by Landlord which are attributable to Tenant's leased premises.

9.2    SPECIAL ASSESSMENTS.    If an assessment for a public improvement is made against the leased premises, Landlord may elect to cause such assessment to be paid in installments in which case all of the installments payable with respect to the lease term shall be treated the same as general real property taxes for the purposes of paragraph 9.1.

9.3    CONTEST OF TAXES.    Tenant shall be permitted to contest the amount of any tax or assessment so long as such contest is conducted in a manner which does not cause any risk that Landlord's interest in the leased premises will be foreclosed for nonpayment.    Landlord shall cooperate in any reasonable manner with such contest by Tenant.

10.    DAMAGE AND DESTRUCTION.

10.1    PARTIAL DAMAGE.    If the leased premises are partly damaged and paragraph 10.2 below does not apply, the property shall be repaired by Landlord at Landlord's expense.    Repairs shall be accomplished with all reasonable dispatch subject to interruptions and delays from labor disputes and matters beyond the control of Landlord and shall be performed in accordance with the provisions of paragraph 6.3 above.

10.2    DESTRUCTION.    If the leased premises are destroyed or damaged such that the cost of repair exceeds 50 percent of the value of the structure before the damage, either party may elect to terminate the lease as of the date of the damage or destruction by notice given to the other in writing not more than 45 days

Page 9 – Commercial Lease
C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 71 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

following the date of damage. In such event all rights and obligations of the parties shall cease as of the date of termination, and Tenant shall be entitled to the reimbursement of any prepaid amounts paid by Tenant and attributable to the anticipated term. If neither party elects to terminate, Landlord shall proceed to restore the leased premises to substantially the same form as prior to the damage or destruction. Work shall be commenced as soon as reasonably possible and thereafter shall proceed without interruption except for work stoppages on account of labor disputes and matters not under control of Landlord.

10.3 **RENT ABATEMENT.** Rent shall be abated during the repair of any damage to the extent the premises are untenantable.

11. **EMINENT DOMAIN.**

11.1 **PARTIAL TAKING.** If a portion of the leased premises is condemned and paragraph 11.2 does not apply, the lease shall continue on the following terms:

(a) Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

(b) After the date on which title vests in the condemning authority or an earlier date on which alterations or repairs are commenced by Landlord to restore the balance of the property in anticipation of taking, the rent shall be reduced in proportion to the reduction in value of the leased premises as an economic unit on account of the partial taking. If the parties are unable to agree upon the amount of the reduction of rent, the amount shall be determined by arbitration in the manner as is provided herein.

(c)     If a portion of Landlord's property not included in the leased premises is taken and severance damages are awarded on account of the leased premises, or an award is made for detriment to the leased premises as a result of activity by a public body not involving a physical taking of any portion of the premises, this shall be regarded as a partial condemnation to which subparagraphs 11.1 (a) and (b) apply, and the rent shall be reduced to the extent of reduction in rental value of the premises as though a portion had been physically taken.

11.2   TOTAL TAKING.  If a condemning authority takes all of the leased premises or a portion sufficient to render the remaining premises reasonably unsuitable for the use which Tenant was then making of the premises, the lease shall terminate as of the date the title vests in the condemning authorities. Landlord shall be entitled to all of the proceeds of condemnation, and Tenant shall have no claim against Landlord as a result of the condemnation.

11.3   SALE IN LIEU OF CONDEMNATION.  Sale of all or part of the leased premises to a purchaser with the power of eminent domain in the face of a threat or probability of the exercise of the power shall be treated for the purposes of this Section 11 as a taking by condemnation.

12.   **LIABILITY AND INDEMNITY.**

12.1   Liens.

(a)     Except with respect to activities for which Landlord is responsible, Tenant shall pay as due all claims for work done on and for services rendered or material furnished to the leased premises and shall keep the premises free from any liens.  If tenant fails to pay any such claims or to discharge any lien, Landlord

Page 11 – Commercial
Lease                                          C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

may do so and collect the cost as additional rent. Any amount so added shall bear interest at the rate of 10 percent per annum from the date expended by Landlord and shall be payable on demand. Such action by Landlord shall not constitute a waiver of any right of remedy which landlord may have on account of Tenant's default.

(b)    Tenant may withhold payment of any claim in connection with a good-faith dispute over the obligation to pay, so long as Landlord's property interests are not jeopardized. If a lien is filed as a result of nonpayment, Tenant shall, within ten days after knowledge of the filing, secure the discharge of the lien or deposit with Landlord cash or sufficient corporate surety bond or other surety satisfactory to Landlord in an amount sufficient to discharge the lien plus any costs, attorney fees, and other charges that could accrue as a result of a foreclosure or sale under the lien.

12.2    INDEMNIFICATION.  Tenant shall indemnify and defend Landlord from any claim, loss, or liability arising out of or related to any activity of Tenant on the leased premises or any condition of the leased premises in the possession of under the control of Tenant, including any such claim, loss, or liability which may be caused or contributed to in whole or in part by Landlord's own negligence or failure to effect any repair or maintenance required by this lease. Landlord shall have no liability to Tenant for any loss or damage caused by third parties or by any condition of the premises.

12.3    LIABILITY INSURANCE.  Before going into possession of the premises, Tenant shall procure and thereafter during the term of the lease shall

Page 12 – Commercial
Lease                                      C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 74 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

continue to carry the following insurance at Tenant's cost: public liability and property damage insurance in a responsible company with combined single limit for damage to persons and property with coverage amounts that are reasonably acceptable to Landlord. Landlord may, by written notice to Tenant, demand that the limits of such insurance be raised to amounts specified in the notice and Tenant shall at the next succeeding policy renewal date, but not later than six months after the date of the notice, raise the limits to those specified in the notice. All limits demanded by Landlord shall be commercially reasonable as of the date of the notice for the use Tenant is then making of the premises and improvements. Such insurance shall cover all risks arising directly or indirectly out of Tenant's activities on or any condition of the leased premises whether or not related to an occurrence caused or contributed to by Landlord's negligence, shall protect Tenant against the claim of Landlord on account of the obligations assumed by Tenant under paragraph 12.2, and shall protect Landlord and Tenant against claims of third persons. Certificates evidencing such insurance and bearing endorsements requiring 30 days' written notice to Landlord prior to any change or cancellation shall be furnished to Landlord prior to Tenant's occupancy of the property.

13.     **QUIET ENJOYMENT; MORTGAGE PRIORITY.**

13.1    LANDLORD'S WARRANTY. Landlord warrants that it is the owner of the leased premises and has the right to lease. Subject to all currently existing encumbrances, Landlord will defend Tenant's right to quiet enjoyment of the leased premises from the lawful claims of all persons during the lease term.

Page 13 – Commercial
Lease                         C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 75 of 91
Case 17-31502-tmb7     Doc 27     Filed 08/11/17

13.2   MORTGAGE PRIORITY.  This lease is and shall be prior to any mortgage or deed of trust ("Encumbrance") recorded after a memorandum of this lease is recorded, if any, affecting the premises.  However, if any lender holding such an encumbrance requires that this lease be subordinate to the encumbrance, then Tenant agrees that the lease shall be subordinate to the encumbrance if the holder thereof agrees in writing with Tenant that so long as Tenant performs it obligations under this lease no foreclosure, deed given in lieu of foreclosure, or sale pursuant to the terms of the encumbrance, or other steps or procedures taken under the encumbrance shall affect Tenant's rights under this lease.  If the foregoing condition is met, Tenant shall execute the written agreement and any other documents required by the holder of the encumbrance to accomplish the purposes of this paragraph.  If the premises are sold as a result of foreclosure of any encumbrance thereon, or otherwise transferred by Landlord or any successor, Tenant shall attorn to the purchaser or transferee.

13.3   ESTOPPEL CERTIFICATE.  Either party will within 20 days after notice from the other execute and deliver to the other party a certificate stating whether or not this lease has been modified and is in full force and effect and specifying any modifications or alleged breaches by the other party.  The certificate shall also state the amount of monthly base rent, the dates to which rent has been paid in advance, and the amount of any security deposit or prepaid rent.  The certificate shall also state any other facts, conditions, provisions, or agreements reasonably requested by the other party.

Failure to deliver the certificate within the specified time shall be conclusive upon the party of whom the certificate was requested that the lease is in full force and effect and has not been modified except as may be represented by the party requesting the certificate.

14.    **ASSIGNMENT AND SUBLEASE.**  No part of the leased property may be assigned, mortgaged, or subleased, nor may a right of use of any portion of the property be conferred on any third person by any other means, without the prior written consent of Landlord.  This provision shall apply to all transfers by operation of law.  This provision shall apply to any sale of a controlling interest in the membership of the Tenant.  No consent in one instance shall prevent the provision from applying to a subsequent instance.  Landlord shall consent to a transaction covered by this provision when withholding such consent would be unreasonable in the circumstances.  Landlord shall not unreasonably delay consent and shall give consent under circumstances where withholding it shall be unreasonable.  In determining whether to consent to assignment, Landlord may consider the following non-exclusive factors:   financial ability and business experience of assignee; competence of assignee; credit history of assignee; and, medical references of assignee.

15.    **DEFAULT.**  The following shall be events of default:

15.1    DEFAULT IN RENT.  Failure of tenant to pay any rent or other charge within ten days after it is due.

15.2    DEFAULT IN OTHER COVENANTS.  Failure of Tenant to comply with any term or condition or fulfill any obligation of the lease (other than the

Page 15 – Commercial Lease

C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 77 of 91

Case 17-31502-tmb7      Doc 27      Filed 08/11/17

payment of rent or other charges) within 30 days after written notice by Landlord specifying the nature of the default with reasonable particularity. If the default is of such a nature that it cannot be completely remedied within the 30-day period, this provision shall be complied with if Tenant begins correction of the default within the 30-day period and thereafter proceeds with reasonable diligence and in good faith to effect the remedy as soon as practicable.

15.3 INSOLVENCY. Insolvency of Tenant; an assignment by Tenant for the benefit of creditors; the filing by Tenant of a voluntary petition in bankruptcy; an adjudication that Tenant is bankrupt or the appointment of a receiver of the properties of Tenant; the filing of any involuntary petition of bankruptcy and failure of Tenant to secure a dismissal of the petition within 30 days after filing; attachment of or the levying of execution on the leasehold interest and failure of Tenant to secure discharge of the attachment or release of the levy of execution within ten days. If Tenant consists of two or more individuals or business entities or this lease is guaranteed by individuals or other business entities, the events of default specified in this paragraph 15.3 shall apply to each individual unless within ten days after an event of default occurs the remaining individuals produce evidence satisfactory to Landlord that they have unconditionally acquired the interest of the one causing the default. If the lease has been assigned the events of default so specified shall apply only with respect to the one then exercising the rights of Tenant under the lease.

15.4 ABANDONMENT. Failure of Tenant for ten days or more to occupy the property for one or more of the purposes permitted under this lease unless

Page 16 – Commercial Lease       C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 78 of 91
Case 17-31502-tmb7     Doc 27     Filed 08/11/17

such failure is excused under other provisions of this lease shall be an abandonment of the property.

15.5  TENANT'S USE.  Any claim that would jeopardize Landlord's continued ownership of the Premises, to include but not be limited to, forfeiture or foreclosure.

16.  **REMEDIES ON DEFAULT.**

16.1  TERMINATION.  In the event of a default the lease may be terminated at the option of Landlord by notice in writing to Tenant.  If the lease is not terminated by election of Landlord or otherwise, Landlord shall be entitled to recover damages from Tenant for the default.  If the lease is terminated, Tenant's liability to Landlord for damages shall survive such termination, and Landlord may reenter, take possession of the premises, and remove any persons or property by legal action or by self-help with the use of reasonable force and without liability for damages.

16.2  RELETTING. Following reentry or abandonment, Landlord may relet the premises and in that connection may make any suitable alterations or refurbish the premises, or both, or change the character or use of the premises.  Landlord shall not be required to relet for any use or purpose other than that specified in the lease or which Landlord may reasonably consider injurious to the premises, or to any tenant which Landlord may reasonably consider objectionable.  Landlord may relet all or part of the premises, alone or in conjunction with other properties, for a term longer or shorter than the term of this lease, upon any reasonable terms and

Page 17 – Commercial
Lease                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

conditions, including the granting of some rent-free occupancy or other rent concession.

16.3 DAMAGES. In the event of default or termination on default, Landlord shall be entitled to recover immediately, without waiting until the due date of any future rent or until the date fixed for expiration of the lease term, the following amounts as damages:

(a) The loss of all rent reserved hereunder from the date of default until a new tenant has been, or with the exercise of reasonable efforts could have been, secured.

(b) The reasonable costs of reentry and reletting including without limitation the cost of any clean up, refurbishing, removal of Tenant's property and fixtures, or any other expense occasioned by Tenant's failure to quit the premises upon termination and to leave them in the required condition, any remodeling costs, attorney fees, court costs, broker commissions, and advertising costs.

(c) Any excess of the value of the rent and all of Tenant's other obligations under this lease over the reasonable expected return from the premises for the period commencing on the earlier date of trial or the date the premises are relet and continuing through the end of the term. The present value of future amounts will be computed using a discount rate equal to the prime loan rate of major Oregon banks in effect on the date of the trial.

(d) Any other sums allowed by law.

16.4 RIGHT TO SUE MORE THAN ONCE. Landlord may sue periodically to recover damages during the period corresponding to the remainder of the lease

Page 18 – Commercial
Lease    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

term, and no action for damages shall bar a later action for damages subsequently accruing.

16.5   OREGON STATUTES.   In addition to all remedies provided herein, Landlord shall have all rights furnished to a secured creditor under the Oregon Uniform Commercial Code and ORS Chapter 87 or its successor as it relates to landlord liens and other landlord remedies.

16.6   OTHER REMEDIES.   In addition to all remedies provided herein, Landlord shall be entitled, at its option, to any and to all other legal and equitable remedies provided under applicable law.

16.7   REMEDIES CUMULATIVE.   The foregoing remedies shall be cumulative and non-exclusive.

## 17.   SURRENDER AT EXPIRATION.

17.1   CONDITION OF PREMISES.   Upon expiration of the lease term or earlier termination on account of default, Tenant shall deliver all keys to Landlord and surrender the leased premises in first-class condition and broom clean. Alterations constructed by Tenant with permission from Landlord shall not be removed or restored to the original condition unless the terms of permission for the alteration so require.

17.2   FIXTURES.

(a)   All fixtures placed upon the leased premises during the term, other than Tenant's trade fixtures, shall, at Landlord's option, become the property of Landlord. If Landlord so elects, Tenant shall remove any or all fixtures which would

Page 19 – Commercial
Lease                                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

otherwise remain the property of Landlord, and shall repair any physical damage resulting from the removal. If Tenant fails to remove such fixtures, Landlord may do so and charge the cost to Tenant with interest at the rate of 10 percent from the date of expenditure.

(b)     Prior to expiration or termination of the lease term Tenant shall remove all furnishings, furniture, and trade fixtures which remain its property. If Tenant fails to do so, this shall be an abandonment of the property, and Landlord may retain the property and all rights of Tenant with respect to it shall cease or, by notice in writing given to Tenant within 20 days after removal was required, Landlord may elect to hold Tenant to its obligation of removal. If Landlord elects to require Tenant to remove, Landlord may effect a removal and place the property in public storage for Tenant's account. Tenant shall be liable to Landlord for the cost of removal, transportation to storage and storage with interest at the rate of 10 percent per annum on all such expenses from the date of expenditure by Landlord.

17.3   HOLDOVER.

(a)     If Tenant does not vacate the leased premises at the time required, Landlord shall have the option to treat Tenant as a tenant from month-to-month, subject to all of the provisions of this lease except the provisions for term and renewal. In such event, the rental rate shall be equal to 120 percent of the last monthly rent owed by Tenant. Failure of Tenant to remove fixtures, furniture, furnishings, or trade fixtures which Tenant is required to remove under this lease shall constitute a failure to vacate to which this paragraph shall apply if the property

Page 20 – Commercial
Lease                                      C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

not removed will substantially interfere with occupancy of the premises by another tenant or with occupancy by Landlord for any purpose including preparation for a new tenant.

(b)     If a month-to-month tenancy results from a holdover by Tenant under this paragraph 17.3 the tenancy shall be terminable at the end of any monthly rental period on written notice from Landlord given not less than ten days prior to the termination date which shall be specified in the notice. Tenant waives any notice which would otherwise be provided by law with respect to a month-to-month tenancy.

18.     **COOPERATION.** Notwithstanding any of the foregoing terms, Landlord and Tenant agree to execute any and all subordination, attornment, non-disturbance, estoppel agreements, or similar documents required by any lender of Landlord or purchasers from Landlord as the same are reasonably required.

19.     **GUARANTY.** Guarantor unconditionally and irrevocable guarantees the performance by Tenant of each and every obligation of Tenant under this Commercial Lease. This guaranty shall be continuing and shall terminate only upon the satisfaction by Tenant of each and every one of Tenant's obligations under this Commercial Lease in accordance with its terms, including, but not limited to, payment of all sums owing from Tenant to Landlord and each and every one of Tenant's performance obligations under the Commercial Lease.

19.1   **GUARANTOR'S CONSENT.** Guarantor consents that it will not be necessary for Landlord, in order to enforce this guaranty, to initiate an action or exhaust its legal remedies against Tenant. Guarantor consents that this guaranty

Page 21 – Commercial
Lease                                 C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 83 of 91
Case 17-31502-tmb7     Doc 27     Filed 08/11/17

may be immediately enforced upon Tenant's default under the Commercial Lease. Guarantor consents that Landlord may, from time to time, modify, alter or change the Commercial Lease without in any way releasing or discharging Guarantor from his obligation hereunder. This guaranty shall not be released, extinguished, modified, or in any way affected by failure on the part of Landlord to enforce all of the rights and remedies available to it under this Commercial Lease.

19.2 BANKRUPTCY OF TENANT. The bankruptcy of Tenant shall not relieve Guarantor of his obligations under this guaranty.

19.3 BENEFIT. This guaranty shall inure to the benefit of Landlord, Landlord's shareholders and their respective successors, heirs, Personal Representatives, and assigns.

19.4 ATTORNEY FEES. In the event of any action to enforce any of the terms or conditions of this guaranty, the prevailing party or parties, shall be entitled to recover from the other party or parties reasonable attorney fees fixed by the trial and all appellate courts, to include the reimbursement of all costs.

20. **MISCELLANEOUS.**

20.1 NONWAIVER. Waiver by either party of strict performance of any provision of this lease shall not be a waiver of or prejudice of this lease shall not be a waiver of or prejudice the party's right to require strict performance of the same provision in the future or of any other provision.

20.2 NOTICES. Any notice required or permitted under this lease shall be given when actually delivered or 48 hours deposited in United States mail as

Page 22 – Commercial
Lease
C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 84 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

certified mail addressed to the address first given in this lease or to such other address as may be specified from time to time by either of the parties in writing.

20.3 SUCCESSION. Subject to the above-stated limitations on transfer of Tenant's interest, this lease shall be binding upon and inure to the benefit of the parties, their respective successors and assigns.

20.4 LANDLORD'S RIGHT TO CURE DEFAULTS. If Tenant fails to perform any obligation under this lease, Landlord shall have the option to do so after 30 days' written notice to Tenant. All of Landlord's expenditures to correct the default shall be reimbursed by Tenant on demand with interest at the rate of 10 percent per annum from the date of expenditure by Landlord.

20.5 RECORDATION. This lease shall not be recorded without the consent in writing of Landlord. Upon request, Landlord shall execute and acknowledge a memorandum of this lease in a form suitable for recording, and Tenant may record the memorandum.

20.6 ENTRY FOR INSPECTION. Landlord shall have the right to enter upon the premises at any time to determine Tenant's compliance with this lease, to make necessary repairs to the building or to the premises, or to show the premises to any prospective tenant or purchaser, and in addition shall have the right, at any time during the last two months of the term of this lease, to place and maintain upon the premises notices for leasing or selling of the premises.

20.7 LATE CHARGE AND INTEREST ON RENT AND OTHER CHARGES. In the event rent or any other payment required of Tenant by this lease is not paid within ten days after its due date, Landlord may impose a late

charge of 5 percent of the delinquent payment. Said late charge may be imposed by Landlord for each month the payment remains delinquent.

Any rent or other payment, including late charges, required of Tenant by this lease shall, if not paid within ten days after it is due, bear interest at the rate of 10 percent per annum from the due date until paid.

20.8 PRORATION OF RENT. In the event of commencement or termination of this lease at the time other than the beginning or end of one of the specified rental periods, then the rent shall be prorated as of the date of commencement or termination and in the event of termination for reasons other than default, all prepaid rent shall be refunded to Tenant or paid on its account.

20.9 DEFINITION. For the purposes of this lease, the term "attributable to the premises" shall mean the number of square feet of the premises over the total amount of rentable square feet in the building.

20.10 SECURITY INTEREST. To secure all payment obligations and other obligations of Tenant to be performed under the terms of this lease, Tenant hereby grants to Landlord a security interest in all personal property of Tenant brought on or stored on the premises, including fixtures, equipment, inventory accounts, and the proceeds therefrom.

Upon request, Tenant shall execute all necessary financing statements to perfect Landlord's security interest and shall file the same with the appropriate governmental agencies.

20.11 ARBITRATION. In the event of a dispute between the parties arising directly or indirectly from the provisions hereof, the parties agree that said dispute

Page 24 – Commercial
Lease                                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 86 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

shall be settled by arbitration. The arbitration procedure shall be as agreed by the parties. If the parties cannot agree, they shall proceed pursuant to ORS 36.300 through ORS 36.365 or its successor.

In such arbitration proceeding, the prevailing party shall be entitled to its attorney fees and costs for the arbitration proceeding and any appeal therefrom.

20.12 TIME OF THE ESSENCE. Time of payment and performance of all terms hereof are of the essence.

20.13 COUNTERPARTS. This Commercial Lease may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. Federal ESIGN Act of 2000) or other transmission.

*[Intentionally Left Blank]*

Page 25 – Commercial
Lease                    C:\Users\Dave\AppData\Local\Microsoft\Windows\Temporar
y Internet Files\Content.Outlook\BB63M0CY\2.10.2017 Commercial Lease.docx

EXHIBIT 1, Page 87 of 91
Case 17-31502-tmb7    Doc 27    Filed 08/11/17

LANDLORD:

L & D OF OREGON, INC.,
an Oregon corporation


By: _Mi. M. S. Jll_          Dated: 02 - 10 2017
    Michael Fassett, President

TENANT:

STORM 3 LLC,
an Oregon limited liability company


By: _Vel R. Kohmann_         Dated: 02- 07- 17
    Valerie Kahmann, Authorized Representative

GUARANTOR:


_Vel A. Kahmann_             Dated: 02- 07- 17
Valerie Kahmann

February 24th, 2017

Member Name
Member Address

**NOTICE OF MEETING OF THE MEMBERS OF FARMINGTON INDUSTRIES, LLC**

| | |
|---|---|
| **DATE OF THE MEETING:** | **FEBRUARY 24th, 2017** |
| **TIME OF THE MEETING:** | **11:30 AM PST** |
| **PLACE OF THE MEETING:** | **DESCHUTES COUNTY LIBRARY**<br>**601 NW WALL ST.**<br>**BEND, OR 97701**<br>**BROOKS CONFERENCE ROOM** |

**TELEPHONE CONFERENCE**
**CALL IN INSTRUCTIONS:**      **DIAL IN NUMBER:**    **515-604-9300**
                                            **ACCESS CODE:**        **702508**

**PURPOSES OF THE MEETING:**      **DISSOLUTION OF THE COMPANY**

**TO ALL THE MEMBERS:**

I am Chris Spoto, the manager of Farmington Industries, LLC, an Oregon limited liability company ("Farmington"). First, I want to make sure your current name, address and social security number is on file for tax purposes. Please provide the following information to [farmington.industries@outlook.com](mailto:farmington.industries@outlook.com) at your earliest convenience.

Member Name
Member Address
Member SSN

As the Manager of Farmington Industries, LLC, and the holder of Eighty Percent (80%) of the ownership interest in the LLC, I hereby call a meeting of the Members pursuant to Section 6 of the Farmington Operating Agreement, dated April 29, 2016 ("Operating Agreement").

Section 6.2 of the Operating Agreement provides that the Notice of the Meeting must provide the date, time and place of the meeting of the Members to be called in writing at least ten days prior to the meeting date. The Notice must include a description of the purpose or purposes for which the meeting is called. The Notice must be mailed to each Member at the address of record (which is the address provided by the Member under the Notice provision in the Agreement Adding the Member).

Section 6.3 states that the Members entitled to Notice of the Meeting of Members and to vote at the Meeting must be determined as of the Record Date of the Meeting. The Record Date of

1

Meeting may not be less than 10 (nor more than 70) days prior to the meeting. **I hereby state the Record Date in Section 6.3 of the Operating Agreement shall be February 14th, 2017 ("Record Date").** All Members of record as of February 14th, 2017 are entitled to Notice of the Meeting and may vote on matters set for the meeting in this Notice.

Farmington has mailed out this Notice which includes all the provisions of Section 6.2 to each of the Members of record on the Record Date.

Set forth below is a summary of the events leading up to the Meeting and the purpose of the Meeting.

## Background Information

After Farmington began construction of its first two 1,000 square foot flower rooms and installed rough electrical, Farmington came up against a capital crunch at the end of 2016.

As the Manager, I immediately executed an intense search for capital funding. The search for capital funding at this time was challenging given the changing and uncertain political climate, the competition that has entered the market, and Farmington's current financial condition. Hence, I felt very fortunate to locate a local venture capital group ("VC Group") who was willing to completely fund the remaining build out and furnish the equipment for the two flower rooms that would have enabled Farmington to begin harvesting and complete the build out of the facility.

Jeff Callahan vehemently objected to me taking this action and wanted Farmington to take on a a series of loans with undefined terms in lieu of bringing on the VC Group. After much deliberation, I decided NOT to bring on the VC Group, but instead to go out and raise additional capital under the same terms and conditions as the initial offering to the members. I approached the VC Group and specifically addressed the issues raised by Jeff, and they agreed to introduce the Company to a number of accredited investors interested in buying into the venture. I informed Jeff of this decision to move forward with an extension of the then-existing private equity capital raise.

Unfortunately, a few days later, while I was in Portland for work, someone stole and destroyed all of Farmington's mother plant stock. 120 of 140 plants were destroyed and/or stolen. Notably, whoever destroyed and stole the plants presumably had access to the building as there was no evidence of a forced entry. They also had specific knowledge of the plant stock in light of the strategic extraction of only certain plants. The female plants left behind were of legacy stock considered to be of no value, and hard-to-identify male plants deliberately left behind pollinated the remainder of the garden. This basically gutted the entire business operations and destroyed any and all future profits. Significant financial resources had been dedicated to the fostering of this mother plant stock, and without it Farmington had no products to grow. As a result of the theft, the investors got spooked and walked away from the deal. This essentially destroyed Farmington and any future it may have had. With $140 dollars in the bank, a lease

payment due and money owed to contractors and other creditors, I was forced to start winding down the company.

I am confident if the mother plant stock had not been stolen or destroyed, I would have succeeded in bringing on the outside investors and moving the company forward. After the company assets were destroyed, the investors' interest evaporated and the company became insolvent.

Due to the insolvency, the company was in breach of the lease, and, with no means to service the lease payment, approached the landlord to address what had previously been an asset, but due to insolvency and inability to make the lease payment became a liability. The landlord terminated the lease so a new occupant could take possession of the leased premises and allow Farmington out from underneath the liability to the landlord for damages and breach of contract. Taking this step protected the last remaining asset of the company, a patent, whose value is unknown, but suspected to be approximately $20,000.

## Dissolution of Farmington

At the meeting, I will be moving to dissolve the company. I can tell you that this is not a decision that I came to lightly. I have spent months trying to salvage the company and your investment, and feel strongly I would have been able to do so if Farmington had not been the victim of a business crime.

I am very saddened by the events that transpired and the dissolution of Farmington. If you have any questions, please send them to me at farmington.industries@outlook.com .


Very Truly,



Chris Spoto
Manager

3